Perhaps they may be receiv'd when there is a faint and lingering hope of recovery by the sufferer.

| The People | |
| v. | MURDER. |
| James Anderson. | |

Present—Hon. *Ogden Edwards*, Cir. Judge, ⎱
  Hon. *Richard Riker*, Recorder, ⎰ Justices
  Aldermen King, Parker and ⎰ of O. & T.
  Doughty, ⎰

*Maxwell*, District Attorney, Counsel for the people.

*J. W. Wyman and Francis A. Blake*, Esqrs., Counsel for the prisoner.

The following persons were called and sworn as a petit jury :—Benjamin Armitage, James De Forrest, John- (See note p. 398.) A. was stabbed with a dagger in the evening, and the next morning (he being very low and could hardly speak) his affidavit was taken, wherein he stated, that B. stabbed him. He was then taken to the hospital, and died in nine days. It was held the affidavit could not be read as the dying declaration of A. no evidence being offered that induced a belief that he was mortally certain he would not survive. The Court, and not the jury, are to decide upon the admissibility of dying declarations.

Downs, James L. Bleecker, Henry Westervelt, Martin Haverstraw, Joseph Harrington, Elias R. Rabbit, Samuel Norswothy, Charles Potsley, Lewis Van Antwerp, Benjamin Stagg.

N'W YORK, March, 1824.

The People v. Anderson.

*Mr. Maxwell* opened the case to the jury. Gentlemen— The prisoner is indicted for the crime of murder, and I am apprehensive that the testimony will be of such a character as to put beyond a reasonable doubt his guilt of this felony. The circumstances attending it were deliberate, cool and calculating on the part of the prisoner, to deprive the deceased of his life. He is indicted for the murder of James Brister, a coloured man who kept an oyster stand in the Bowery, against whom he was at enmity, on account of an intimacy which he suspected existed between the deceased and his wife. On the 28th of October, in the evening, the deceased was passing along the Bowery, when he heard some person behind cry out, " Brister, Brister," and in a moment he felt the thrust of a dagger or a knife in the left side of the breast, which occasioned his death. The prisoner attempted to repeat the blow; the deceased fled, pursued by the prisoner. The unfortunate man having received this wound went to the place where he lived. Dr. Frumel was immediately sent for—he attended the man at the time; he was in the greatest agitation, and was under the full expectation the wound would occasion his death. At that time he stated the name of the man who had given him the wound, and continued to repeat the declaration that Anderson was the man, both at home and at the police office.

Anderson was arrested on the following day. He denied that he had been in the Bowery, and that he had given the wound to the deceased. Search was however

N'W YORK, made at Anderson's house, and in the bed was found, un-
March, 1824. der the pillow, a dagger, which I now produce before
The People you, and with which the wound must have been inflicted.
v. These, gentlemen, are the circumstances of the case.—
Anderson. If you shall believe that the prisoner at the bar is the
party who inflicted the wound—if you shall believe that
he had the malice which is either expressed or implied
by the law, and if you shall believe that Brister died of
the wound, then, gentlemen, you can have no difficulty at
all. But it is my duty, gentlemen, to direct the attention
of the court and jury to the proper principles of the law,
by which the distinction between murder and manslaugh-
ter is broadly and distinctly drawn. (Here the prosecu-
tor read from 1 East. P. C. 214. 224. 234. approved au-
thorities of criminal law, the usual definition of murder,
the testimony necessary to constitute it, and the distinc-
tions between murder and manslaughter, &c.) I have
now, gentlemen, read to you the law to which I wish you
to direct your attention. You, gentlemen, are constituted
by the law, the judges as well of that law as of the fact.
For the present I shall content myself with the statement
I have made of the law and of the fact, and will produce
to you the testimony, to which I invite your consideration.

### EVIDENCE.

*Doctor Marinus Willett, Jun.* was the first witness sworn. He is a
surgeon in the hospital. The wounded body of the deceased was brought
to the hospital on the 30th of September, 1823, and died on the 9th of
October. He described the wound, which was on the left side; the
dagger passed through the skin, passed through the membranes round
the heart, grazed the lower part of the heart, and terminated in the liver,
and corresponded with the instrument now in Court, which is the same with
which he measured the wound at the time. That wound was enough
to have produced his death. That wound was the cause of his death.

*Cross-examined.* An inflammation of the membranes of the heart may arise from other causes; but in this instance it was caused by the wound. Could not perceive how a fall should have produced such an inflammation. There was evidence of great disease about the liver, which might ultimately have killed him.

*William Sutliff* testified that he is a city watchman. The prisoner at the bar was brought into the watch-house, about the last of September, by another watchman, and witness brought him down to the police. The key [now in Court] was found on the prisoner. Witness went to prisoner's house in Orange-street, and found a bed and a chest. The key unlocked the chest. When the prisoner was in his custody, he denied having stabbed the deceased, or knowing any thing about him.

*John Trenchard* testified, that he is one of the city watch, and arrested the prisoner in Orange-street, in a house where he was found in bed. A dagger (the same now in Court) was found under his bed, alongside of the chest which the key fitted. The bed lay on the floor. When arrested, witness denied having stabbed deceased. He took him to the house of the man who was stabbed, where prisoner asked Brister what he was going to send him to prison for? Brister replied, "because you have stabbed me with a dagger." Prisoner replied, "Do you say I stabbed you?" "Yes," said the deceased, "you are the identical man, and I will take my oath of it." [Blake objected to this testimony, as being an indirect way of availing himself of the assertions of the deceased. Maxwell said he was only showing the conversation between prisoner and deceased.] The dagger was concealed under the head of the bed on which he lay. The dagger now in Court is the same—saw no blood on it then.

*Cross-examined.* When he arrived at the house of the deceased, he appeared to be badly wounded. He spoke feebly—and it was supposed that his wound was mortal. When he charged the deed on the prisoner, he did so without anger, and with great mildness. Prisoner was cross and angry. Sutliff found the dagger.

*Sutliff,* called again.—He found the dagger in the sheath; the same as now in court; there were spots on it, which he thought were made by blood.

*Michael Riley* (black).—The deceased lived in the house with him. He has known the prisoner for some time, and a quarrel had existed between prisoner and deceased for about eighteen months. Prisoner told witness, in Pearl-street, about eighteen months ago, that he meant to have satisfaction out of Brister, and then he did not care what became of him. The quarrel was in relation to some woman. Prisoner told witness that he thought Brister kept his wife. Witness was not at home when deceased was wounded—heard of it in about half an hour, when he saw deceased. Witness had informed deceased of prisoner's threat. Had known the deceased two or three years, and the prisoner eight or nine years.

*Cross-examined.*—Witness had never been treated ill by the prisoner, but his character was bad. He used to abuse his family, and beat his wife. He has a bad temper. Has had no quarrel with him, and is his friend.

*N'W YORK, March, 1824.*

The People
v.
Anderson.

N'W YORK,
March, 1824.

The People
v.
Anderson.

*Smith Ovutt* (Police Justice,) testified, that he went to the house of the prisoner on the evening after the man was stabbed, and was present when the dagger was found under the head of the bed, which was against the chest which was opened by the key Sutliff had taken from the prisoner. The key and dagger are the same, and have been kept in the police office. He took the key from Sutliff, who took it from prisoner in Bridewell.

*Sutliff*, called again.—He saw prisoner unlock the chest with that key.

*James Hopson*, Police Magistrate.—The examination [produced now by Maxwell] was taken by witness, after cautioning prisoner, and advising him to send for counsel, which he did. Witness told him he need not confess any thing unless he chose to do so. [Witness always gives this caution in important cases.] , The examination was taken on the 10th day of October, the day after Brister died. [The examination was then read.] From this document it appeared that the prisoner is a native of Africa—was brought to St. Domingo when young—was a young man when the troubles broke out. Acknowledged the chest, key. bed and dagger—had kept the dagger among the rubbish in his chest—took it out on the Sunday before the affair—put it under his bed on the night in which Brister was stabbed—had had a quarrel with Brister about his wife. On the evening on which Brister was stabbed, prisoner met him walking arm-in-arm with his wife. They came out of a cellar together—as prisoner approached, his wife shoved deceased off—he went to the side of the street, took up a brick-bat, and made as though he would throw it at him. Prisoner did no more than to defend himself.

*Riley*, called again.—Produced the bloody clothes which deceased had on when he was stabbed. [The hole in the vest corresponded with the size of the dagger, and the place of the wound.] [Maxwell was proceeding to examine him as to the declarations of the deceased. Blake objected, and read from Phillips' Evidence, p. 200., and Pleas of the Crown, 1st East, p. 353., to show that the declarations of a person deceased are not to be taken in testimony, unless the wounded person is fully aware of his situation, and probable and speedy death. Maxwell referred to Radburn's case, 1st Leach's Crown Law, p. 458., which he contended at once did away all difficulty. In this case, the wound was inflicted on the 29th of May, and she (Hannah Morgan) went to the public officer on the 8th of June, and gave information, &c. and died in July ; and when her testimony was taken, it did not appear as though she was a dying woman. On the trial of the perpetrator, the same objection was taken, as is now raised, but was overruled by the Judge. The question was carried up, and the decision of the Judge was confirmed by the whole eleven Judges—Lord Mansfield being absent.] The examination was continued. Witness watched with deceased that night, and deceased, while in bed, told him that he did not think he should ever recover. Complained of being in much pain, and spoke as though he expected he should not recover; and when he got to the hospital, he told witness (three days after) that he was certain he should not now recover. [Blake again objected to putting the question respecting the declaration of the de-

ceased, as to the person who had stabbed him, and argued the point. Maxwell replied, and dwelt upon various authorities, which he quoted. Blake replied, and Maxwell rejoined. Wyman observed, that as it was an important question, which does not appear to have been decided in this country, he thought the Court should reserve the point, that they might avail themselves of the benefit of it, hereafter. The Court decided, that the declaration of the deceased, after he had told the witness that he could not recover, must be received as proper testimony.] The examination proceeded. When at the hospital about three days after the deceased was stabbed, he said he should die, and he laid his death to the wound. And he told witnes before he went to the hospital, and afterwards, after the above declaration, that he was stabbed by James Anderson, the prisoner at the bar. He always told the same story, and was positive. When asked if he was trying to do any thing for himself, he said—" Yes: he was trying to make his peace."

*Cross-examined.*—Has heard deceased say, that if Anderson interfered with him, he would flog him. [An abortive attempt was made to set aside the testimony of this witness, on the ground that he was born in Virginia, and that all blacks are there born slaves : and consequently the presumption is, that he is a slave. Witness testified that he was born free—never was a slave. Maxwell denied that all blacks were born slaves in Virginia, but he hoped that we were not trying this case by the laws of Virginia. The Court overruled the objection.]

*Mr. Ovutt*, called again ; took the affidavit of deceased, on the morning after he was stabbed, which was the 29th of September, Spoke low and feeble—said he thought the dagger penetrated the back-bone.

*Maxwell* now moved to read the affidavit of the deceased. The testimony of Riley shows that deceased was apprehensive that he should not live, the night before.

*Ovutt* called again by the Court.—Deceased was formally sworn, and appeared perfectly calm, collected, and in his right mind.

*Riley* examined again as to the situation of his mind. Perfectly calm, and in the possession of all his senses.

*Trenchard* testified to the same.

*Mr. Stevens,* (Clerk of the Police,) testified that he accompanied Mr. Ovutt to take the deposition. Witness wrote down the deposition, and read it over to the deceased, who was calm and collected, and in his right mind. Thinks the deceased spoke of the wound as a mortal one, but does not recollect the words used.

Here the case for the prosecution was rested.

Mr. Wyman for the prisoner, opened the defence, and contended, generally, that the Attorney for the prosecution had failed in sustaining the indictment. The testimony which he had introduced was circumstantial and inconclusive. But in order not only to make the innocence of the prisoner highly probable, and indeed morally certain, his counsel would be able to satisfy the jury that he has hitherto sustained a fair and good character ; that his conduct has been very correct, as will be testified by a number of persons who have been acquainted with him for some years. I do not, said Mr. W. know that we can produce any evidence as to what has

N'W YORK,
March, 1824.

The People
v.
Anderson.

N'W YORK,
March, 1824.

The People
v.
Anderson.

been proved by the witnesses for the prosecution. But it will appear that at seven o'clock he was in the house of one of his friends, whence he went to the house of another, by whom he was accompanied to that of a third. At ten o'clock he went home and went to bed; and the inhabitants of the house saw nothing more than usual in his deportment. We will now submit to you gentleman, to see whether or not the prisoner is guilty. The Court will lay down the law to you, and you will then be enabled to judge both of the law and the fact.

*Mr. Sutliff* was called again, and thinks the dirk, as it now appears in Court, looks exactly as it did when it was found.

*William Taylor* (black)—heard of this unfortunate affair next morning. In the first place, prisoner came to his house about seven o'clock the night before—returned again about 8, and went away about 9; clock struck just as he went away. Lives at No. 1 Spruce-street—said he would go home and go to bed. Has known prisoner 10 or 12 years. All he ever saw of him, believes he is an honest man, and of good principles.

*William Gordon*, (black)—heard of the affair next morning—was at Taylor's that night, and went out when the clock struck 9, and walked into Chatham street—stopped some time—talked at the gate; prisoner wanted witness to go home with him—did not go with him, as it would be out of his way. Prisoner then said he would go home and go to bed. Witness went back to Taylor's; from thence went home, when it was near 10 o'clock. Prisoner was lame: there had been a corn on his toe which he had cut, and it prevented his walking.

*Cross-examined by Maxwell.* Is a married man, and lives at No. 9 Warren-street. Had been at prisoner's house in Orange-street. Prisoner wanted witness to go to Church with him. Prisoner said nothing about Brister that night. About a week before, prisoner told him that he had put Brister in prison once, on account of his wife, and he intended to pay no more attention to him. The first he ever heard of the intimacy between Brister and Anderson's wife, was at the door of Anderson's house, about two or three months before this affair. Brister came up to Anderson's door—Anderson ordered him away—Brister laughed at prisoner—mocked him about his wife; and said he would slam him to pieces. Had been at prisoner's house in Orange-street but once—prisoner had a dagger, which he said Gen. Yates gave him. He kept it under his bed—sometimes sticking up in his house. Never heard him threaten to use it, but said he would have satisfaction of him by law. This was when prisoner found his wife in deceased's apartment, pretty near a year since. Has heard deceased boast of his intimacy with prisoner's wife. Prisoner is a fine hearted man, yet rash and quick, but can be easily calmed. Brister pretended to be a religious man.

*Ann Bings*, (coloured woman,) with whom prisoner boarded. He came home a little past 10 o'clock, and went to bed. She saw nothing unusual in his appearance. He was not intoxicated, though in the habit of being so. When the watchmen came, she went up stairs with them; this was about three quarters of an hour after he came home. Never heard him speak of a dagger, nor did she know that he kept one. He had told her that he was a married man, but

did not live with his wife, because she was dissatisfied with him.— Has seen him quarrel with his wife, and strike her. Is a quick tempered and violent man, when in a passion.

*Thomas Chatterton.* Had known the prisoner for four or five years, as a boot black in his neighbourhood. He was considered a civil, industrious man. Never had head any thing against him.

*Dr. Francis U. Johnson.* Knows the prisoner, who served him about 18 months, in 1821 and 1822, as a servant; he was a faithful, honest, and good one. Has not known him since, but then considered him an honest man. Saw no bad temper : on the contrary, he was good natured and obliging.

*Leonard Rodgers.*—had known the prisoner for 10 years, and as far as he knew, he was an honest, good kind of a man. Prisoner had followed the sea a good deal—had often bought goods of him; and when he trusted him, he would always come and pay him when he returned. He had made a good deal of money at one time and another, and formerly had put money into his hands to keep for him.

*Isaac Babbitt*—had known the prisoner five or six years, and his character as far as he knew, was very good. Witness was a clerk to Mr. Rodgers during the time mentioned in the testimony of Mr. R.

*Isaac Kipp*—had known the prisoner five or six years, as an honest, industrious man. Prisoner's shop had been nearly opposite to witness's residence. Never heard of any of his violence, except something about his wife.

Mr. Wyman remarked, that they had many witnesses subpœnaed to testify to the same point, who (on calling,) did not appear to be in court. He had heard, however, that Mr. Maxwell, (the prosecuting Attorney,) had known the prisoner, and, if that gentleman had no objection, he would request him to be sworn. Mr. M. said he had no objection, and

*Hugh Maxwell, Esq.* was sworn.—He had known the prisoner some five years since, and employed him as a boot-black—he then bore the character of a sober, honest, industrious man.

*Dr. Willett* was called again, to examine the rent in the vest. The vest was put on by the witness, (Riley,) and the doctor examined the situation of the hole; he said it must have been pretty nigh the spot where the deceased was stabbed.

By the Court.—We think the deceased was pretty well convinced when he came into the hospital, that he should not recover. Within one or two days of his decease, he was informed that his case was hopeless, but he was in great distress, and probably not in his right mind. His sufferings were very great. His impression is, that deceased told him he had been stabbed, but is not certain. His mind good, and he was perfectly himself for five or six days after he arrived at the hospital. He was spoken to about being prepared to

N'W YORK, March, 1824.

The People
v.
Anderson.

render his final account, and he listened with some attention. It is the impression that deceased did mention the name of the person who stabbed him, but does not recollect it. He did not question him particularly. He does not think that deceased apprehended death so much from his sufferings, at first, as from the knowledge of the depth of the wound.

*Riley*, called again. The deceased was a younger, and a stronger man than the prisoner.

*John N. Adriance*—testified to the good character of the prisoner for five or six years. Never knew but that his disposition was mild. Appeared to show a great deal of affection for his wife.

*Thomas Carpenter*—lives in the neighbourhood, and confirmed the above—never saw any thing as to the trouble with his wife, although he had heard of it.

*Elisha Morrill*—knew the prisoner as much as eight or ten years ago, in Nassau-street, and confirmed his good character.

*Noah Wetmore*, Superintendent of the Hospital. The deceased was admitted, like others, into the hospital. Witness visited him as he did other patients. The case was a critical one; but witness does not recollect that deceased was particularly apprehensive about his situation.

The counsel for the prisoner here rested his defence; and

MAXWELL then renewed his application to read the affidavit of the deceased. And, after considerable deliberation,

THE COURT delivered its opinion at length, and went into a close examination of the testimony bearing upon this point.

*Edwards J.* There can be no doubt as to the law upon this subject, where the testimony of the deceassd is taken under a strong belief that his case is hopeless, and that he is soon to appear before his Maker; nor should it be excluded in all cases, where there was a faint and lingering hope of a recovery.* But in the present case, the deposi-

*1. It has been repeatedly decided that the dying declarations of a person mortally wounded, who is conscious of approaching dissolution, are to be received, whether he expresses his belief that he will survive or not. 2 Leach, 563. 1 East. P. C. 353. 1 Chit. C. L. p. 464. The situation of the deceased may be such after a wound given, as to incapacitate him for conversation to the extent necessary to express his belief of his situation, and yet upon being interrogated may designate by name the person who caused his death: his consciousness of approaching death may be

tion of the deceased was taken the day following the in-
fliction of the wound; but the Court could find no positive
testimony that the deceased was morally certain that he
could not survive, until the time of his declaration to the
witness, (Riley,) three days afterwards.   And if he was
previously convinced that there was no chance of his re-
covery, it is certainly very strange that he had not said so,
especially to his most intimate friends.   It is a settled prin-
ciple, that in all cases involving the life of a human being,
every doubtful point is to be construed in favor of the ac-
cused.   In the administration of the justice of the country,
the law imposes the same duty upon both judge and jury;
and where the matter of fact is at all doubtful, both court
and jury should lean to the side of mercy.   The Court
have kept this question suspended for several hours, and
after due advisement, the learned Judge remarked, that
they could not take it upon them to say, that when the
affidavit in question was taken, the deceased rested under
that firm expectation of speedy death, as to warrant the
receiving of his declarations as the testimony of a dying
man.   The affidavit, therefore, cannot be received.   But
the declarations of the deceased after the declaration to

gathered from the *wound* and from the *illness* of the party.   Ibid. Swift's
Ev. p. 124.   6 St. Tr. 195. 201.

2. No principle of law is better settled, than that, where it appears
the party was not conscious of his approaching dissolution. although he
might be actually dying when the declarations were made. they cannot
be received in evidence.   Woodcock's case, Leach, 563. and Radburn's
case, p. 364.

3. In all cases whether the deceased was conscious of approaching
death at the time the declarations were made. is a fact to be decided by
the *Court*, and is not to be left to the jury.   I East. P. C. 353 2 Leach, 360.
563.   But see Woodcock's case, Leach, 563. McNally's Ev. 263 264.

4. I cannot find in any case, English or American, an authority that
the declaration of a dying person can be received as evidence *when he has
a faint and lingering hope of recovery*.   On the contrary, if he thinks he
will eventually recover, though he be actually dying, his declarations
cannot be received.   Dingler's case, Leach, 638. Chit. C. L. vol. 1. p. 464.

Riley, on the 3d day, at the hospital, is to be considered as proper testimony.

The defence was then commenced by Mr. Blake. It is certainly painful to have to address a jury on such subjects ; and when the prosecuting attorney stated to you this morning that he feared the evidence was such as must establish the guilt of the prisoner, I was afraid the case could not be resisted. But very different are my feelings now ; and entertaining as I do, from the laborious investigation you have given to the evidence, a conviction of this man's innocence, it will gratify me if by my very feeble abilities I shall be able to impart this conviction to your minds. The responsibility you have to discharge is solemn, and will be duly weighed by you ; for your sentence, if given against the prisoner, is loss of life—loss of that which cannot be recalled. The liberty, the property of man you may take, and if error has directed the decision, it can be restored ; but life once gone, and the Deity alone can then show mercy. Man's power ceases at the grave. As to presumptive evidence, gentlemen, I am not about to occupy you, and seek to harrow up your feelings, as was done by learned counsel last night, with cases, part of which may be true, but of which the greater part was probably false ; nor do I mean to inveigh against circumstantial evidence at large, seeing that such evidence can alone sometimes lead to the detection of guilt ; but to caution you that such a degree of certainty is necessary as will enable you to say, beyond all reasonable doubt, that the prisoner is guilty. [The counsel here read from Phillips an extract as to the nature of evidence, and particularly on Justice Buller's charge. The counsel went on to refer to Lord Hale, 229, 230.] The prosecuting attorney will possibly urge in this case that if the prisoner

here be not convicted, no conviction can be had ; yet gen-
tlemen, it cannot be doubted by any one, that in the case
yesterday, (alluding to Johnson's case,) the chain of testi-
mony was complete without the confession ; but how dif-
ferent from this. Circumstances which can justify a verdict
of guilty must be such as are proved to have existed, and
cannot have existed compatibly with the innocence of the
prisoner. As to the facts in this case, gentlemen, it will be
doubtless gravely urged to you that threats thrown out by
the prisoner eighteen months ago evince malice against the
deceased ; threats, gentlemen, that were extorted by the
notorious fact of the deceased having seduced and borne
off the wife of the prisoner, a provocation which not one
in the jury box, I am sure, would not have resented, not
merely with threats, but with punishment. The prisoner
is a black man, indeed ; but a black man has feelings
like us—feelings that are to be lacerated by the greatest
calamity that can befal any man, black or white. But
how did the prisoner behave under this provocation?
With moderation to the laws that many of higher station
and degree would not have exhibited, he applied for re-
dress to the tribunals of his country, and had the deceased
punished. This showed no malice nor lawlessness. The
next fact is the finding a dirk in possession of the pris-
oner; and because an old dirk, given to him by an old
master, and kept as a keepsake, is found in his house, he
must be the murderer : and the prosecutor gravely meas-
ures the length of the wound, and the breadth of the
rent; and actually, before your eyes, fits the dagger to the
rent of the waistcoat, and says, " look there ! this must
have been the instrument." Gentlemen, we should not
have far to go to find many daggers that, pushed in a
little more or a little less, would fit the rent also. Then

N'W YORK, March, 1824.

The People v. Anderson.

as to the prisoner's examination, which has been read, though not intentionally, on the part of the justice, it is manifestly calculated to entrap; yet, such as it is, it is much more indicative of innocence than guilt. (His counsel here examined the nature of the police examination, and inferred from it the fact, that it bore all the appearance of a cross-examination of a witness by an intelligent lawyer, and not like a document drawn up merely for the discovery and assertion of the truth. After alluding to the other facts in evidence, the counsel adverted to the self-possession and calmness of the prisoner, as contrasted with the agitation proved to have been evinced by Johnson yesterday, and inferred from it, with considerable force and ingenuity, that nothing but conscious innocence could have sustained a poor, friendless, ignorant man, under such a trial,— a trial under which the comparatively more influential, wealthy, and intelligent criminal of yesterday sunk.) As to the dagger, so far from operating against, it will be found to confirm, the innocence of the prisoner, and that from an almost miraculously immaterial circumstance. The surgeon, it will be remembered, testified that the blow inflicted must have required considerable force: the watchman, too, states that the appearance of the dirk is the same now as when found. Well, gentlemen, this blade is now spotted, not as one of the witnesses imagines, with blood, but with a soft substance, more like cobbler's wax than any thing else, which easily comes off, and which I feel very confident you will say, could not have remained on, after so desperate a thrust as that inflicted on the deceased. This apparently immaterial circumstance you will, I am sure, say, when you come to examine the dagger in your room, is of high importance to the prisoner. But not only did

N'W YORK
March, 1824.

The People,
v.
Anderson.

this dagger probably not inflict the wound, but is it not presumable that the deceased was mistaken in the person who gave him the blow? It was dark; the complexion of the parties increased the difficulty of discerning features, and it might as well, for aught that could be seen, have been any other black man as this. The counsel concluded an address of no inconsiderable force and merit, by a strong appeal to the extraordinary excellence of the character of the prisoner, as established by witnesses inferior to none in the city for respectability.

*Mr. Wyman* followed on the same side. He would make but few observations in addition to those they had heard. In this case, it must be found, first, that there has been a slaying, and then that it has been accompanied with malice aforethought. As to the declaration eighteen months ago, that prisoner would have satisfaction, it cannot be held by you as that sort of malice contemplated by law, even if taken in its utmost latitude; but even this has been explained by the witness, Gordon, to refer to satisfaction by course of law. The chief evidence in this case is circumstantial, a species of evidence always to be received with great caution. (The counsel cited instances of its fallibility.) We look to you, gentlemen, so to examine and sift the testimony as that, if it can be done, the fact of the murder may be made out, and yet the prisoner at the bar be innocent. (The counsel then examined separately the testimony given by the respective witnesses, commenting on them as he proceeded, and contrasting them where they differed, and concluded, by urging upon the jury, that from all the circumstances, from the confidence prisoner had manifested in his own innocence, from his retaining in his possession that dagger, which, if it had been in his hands the instru-

ment of murder, he would have disposed of beyond the reach of human eyes, they could not but believe that James Anderson was not guilty.)

*Maxwell,* District Attorney.   In our country it does not often happen that public officers and tribunals are called on to pronounce on cases of life or death.   It is happy that we live in a community where the life of man is thus tenderly regarded; and in proportion to the infrequency of such trials, is the unwillingness to act when such cases occur.   But it is not a light matter; nor is it proper to set out on such occasions with a desire to look for circumstances justifying prisoners, when such circumstances can only be sought out at the expense of the facts.   It is painful to every man of humanity to pass against the life of a fellow being, no matter what colour the Almighty may have stamped upon him, even under the conviction of guilt; but such feelings must be discarded in the discharge of a public duty, and, as the humble minister of the law here, I must say that in my judgment such is the nature of the evidence in this case, that you must convict the prisoner at the bar.   Before entering on the body of the cause, I will advert briefly to a few objections made in the able and eloquent defence that has been made : the first is as to time—that there was not time enough between the period when Gordon separated from prisoner in Chatham street, and half past 9 ; and Mrs. Binks tells you the prisoner came home about a quarter past 10, and it was not 11 when the watchman took him up.   Riley tells you it was half past 10 o'clock when he found the deceased wounded in his cellar.   I submit to you, then, whether there was not ample time between that when the prisoner parted from Gordon in Chatham street, and that at which he went home, to go up to 37

Bowery, and inflict the wound in question ; it is obvious there was. Then as to the matter on the dagger :—I do not mean to enter into the discussion of whether this be cobbler's wax, as said, or clotted blood ; but admitting it be as contended by the counsel, shoe-maker's wax, I submit to you whether it be not so hard as to resist the blow supposed. If gentlemen doubt, I invite them to make an experiment on doubled clothes, and they will find it will penetrate the folds without breaking off or erasing this matter ; and when penetrating the body it was lubricated by the blood it shed, and its passage rendered easy. But this dagger, says the counsel, if the prisoner had been guilty, would have been thrown from him, and all trace of it be lost. Sir, if the prisoner had supposed that the life of his victim could have survived the deadly blow long enough to reveal the name of the murderer, that dagger would never have been seen in this court. It was confidence in the efficacy of its plunge that induced its owner to preserve it. But character is relied on. It is a melancholy truth that many in this country and in England, who have stood in the fullest confidence of their fellow citizens, have nevertheless been guilty of crimes. (The case of Dr. Dodd in England, and Noah Gardner in this city, were particularly referred to, as proofs, that character of itself was no security against crime.)

Having said thus much as to the objections, I will refer to the facts in proof. It has been asked what motive could influence the prisoner to this crime ? A passion, gentlemen, more deep, more violent, more headstrong, than even that thirst for pernicious gold which but yesterday, we saw had driven another to commit the crime of murder—the passion of jealousy. Gordon, the friend of the prisoner, has stated the existence of this feeling, and

it explains the conduct of the prisoner. Nor is this a jealousy existing in the mind alone. Gordon tells you that three months before this murder, you have it in evidence, that deceased taunted prisoner about his wife. You have, too, in evidence the threats of the prisoner. Can it be said, then, that with these threats, this quarrel, another person could have perpetrated the crime? If any quarrel had existed between the deceased and any one else, it might have been proved, and must at any rate not be assumed. (The district attorney then examined the testimony at length, laying particular stress upon the declaration made by the deceased to Riley after he went to the hospital, and believed himself dying, that the prisoner inflicted the wound; and also upon the examination of the prisoner, as taken at the police office the day after the death of the deceased.)

Having gone through the facts, I will call your attention, in order that we may not differ about the law, to some few authorities, and it shall be briefly. (Referred to 1 Chitty, 234. respecting the undue enormity of punishment inflicted for a slight transgression; quoted in reference to, and in the hypothesis of the truth of the statement in prisoner's examination, that on the evening of the assault deceased first took up a brickbat as if to attack prisoner. Other authorities were also adduced on the general points.)

Gentlemen, the prosecutor concluded, I have now done my duty. It has been a painful duty, and one in the discharge of which, I trust, you will not think I have been unduly pressing; and I can only pray that you may differ from me, if you can do so consistently with your oaths.

*By the Court.*—So much has been said, gentlemen, relative to the declaration of the deceased, that we consider it necessary to caution you in the outset that it is important you should separate in your minds, and devest of all effects, the affidavits which may have been said to be made by deceased, or the mere assertion of counsel, from what has been legally proved. That the deceased came to his death in a violent manner, is not disputed; it is for you to decide whether the prisoner at the bar inflictted that wound; and if so, under what circumstances: whether under circumstances that would constitute it murder or manslaughter, or justifiable homicide. (The Court here marked out the distinctions between these offences, and then recapitulated the facts in evidence.) In reference to the attempt to prove an *alibi*, all the time had been accounted for but about fifteen minutes; and it is to be conceded those 15 minutes might have been sufficient for the commission of the crime. Assuming, for the sake of argument, that he did commit this crime, it then remains to be seen with what disposition it was committed. (With this view the judge read Gordon's evidence over, thinking it highly material, and commented upon it, particularly on the fact that prisoner had invited that witness to go home with him, which appeared to negative the idea, that the prisoner at that time contemplated murder.) Then, as to the lameness of the prisoner, it also appeared very material, as it rendered it difficult to reconcile with probability the idea of this lame old man attacking, with premeditation, and with such an instrument, a young athletic man, as deceased is proved to have been. (The Judge carefully read and weighed all Gordon's testimony.) He then adverted to the examination of the prisoner—put it to the jury to deter-

N'W YORK,
March, 1824.

The People
v.
Anderson.

mine whether, under all circumstances, the interview between deceased and prisoner was not an unpremeditated thing. The confession of the prisoner appears to bear the intrinsic marks of truth ; for his story is one that would hardly have been feigned or contrived. After all this investigation, it remains to be ascertained what crime was committed. It is clear, there was no cool, premeditated malice. There may indeed be murder, without long meditation ; but the story here is, that prisoner was menaced by a young, athletic man, with a brick-bat.— If, in order to save himself from such an assault, he had used his dagger from a belief that his life was in danger, it would be justifiable homicide. If he could have escaped by flight, but chose to remain at the hazard of life, it is manslaughter, but no murder. Connected with this part of the case is this dagger, and this is undoubtedly an unpleasant feature of this affair. How prisoner came to carry this dagger, is the question. It appears there was a previous quarrel between prisoner and deceased, and the prisoner might have thought himself liable to have been assaulted by deceased, and armed himself to guard against it: but even if this were true, it cannot be considered a justifiable act to be thus armed ; as the consequences of going so armed, often proves fatal to life. The reasons suggested may perhaps account for the prisoner being armed with this dagger, without imputing necessarily an intention to commit murder.— Then, as to the declarations of the deceased—that made in the presence of prisoner, when carried to deceased's house by the watchman, being as promptly and fully denied by prisoner, must not be considered as going for any thing. As to the declarations to Riley, after deceased became aware of his approaching death, that

N'W YORK,
March, 1824.

The People
v.
Anderson.

" Anderson stabbed him ;" this is the naked fact : but Anderson may have stabbed, and yet not have murdered him. And may it not be inferred, that at such a moment, if deceased had not been conscious of some provocation on his part, of having been the aggressor, in a high-handed manner, he would not have reflected with satisfaction on his own conduct, and would have spoken, therefore, without anger, of the prisoner's act? As to these confessions, too, if you should be of opinion that the court decided wrongly in admitting them, as evidence, you are at liberty to, and must reject them. You are also, if they are received by you, to weigh them with other testimony, and determine for yourselves as to the degree of credit to be attached to them. After treating of all the other topics, the Judge said, that as to the character, it must be admitted that the prisoner had established a very excellent one ; but character, it must be borne in mind, was too often forfeited. After all, gentlemen, the case rests with you. If guilty of murder, it is your duty to say so, and the law must have its course. If you think him guilty of manslaughter, you will say so : but you must only pronounce a verdict of guilty of murder with a clear conscience, not by a mere inclination, as by the dust of the balance of your mind, but according to rational evidence. If not guilty of murder, in your judgment, it is competent for you, under the indictment, to bring in a verdict of manslaughter; with these remarks I deliver the cause to you.

The jury retired at 11 o'clock, and at half past 11, returned with a verdict of " GUILTY OF MANSLAUGHTER,"