JUDGE PETERS
delivered the opinion oe the court.
Timothy Young, having shot and killed Jack McHone, was indicted in the Jackson Circuit Court for murder, and upon his trial, having been found guilty by the jury, and judgment of death having been pronounced against him therefor by that court, he has appealed to this court for a reversal of that judgment, on the grounds that illegal evidence was permitted to be given against him, and the jury was misled by erroneous instructions.
After F. M. Young had been introduced as a witness for appellant, Jesse Lewis was examined on behalf of the commonwealth, and proved he was acquainted with F. M. Young; knew him before 1863; that he was about twenty years of age; his general reputation for honesty was not good; that his reputation was that he and all the Youngs, including the old man, would steal hogs. This evidence was objected to, and the jury were then told by the judge that they must disregard it as evidence except as it might affect Frank Young; but after the jury was thus instructed with reference to that evidence, the witness was permitted to state that he did not intend to include Nancy Young, who had testified in behalf of the accused, as one who had been charged with hog-stealing, as she was not grown, and had not formed a character; but he meant to include the old man and all his boys except Thomas Young. This was objected to, but the court permitted it to go to the jury.
The doctrine may be said to be authoritatively settled that evidence of the good character of the prisoner is admissible, on the ground that an individual who has *316 maintained an unblemished character up to the time when he is charged with crime may avail himself of that fact as some evidence that he has not committed the crime with which he is accused. But the prosecution is not allowed to call witnesses to the general bad character of the prisoner, unless to rebut the evidence of good character already adduced by him; and even this has recently been denied in England. And the evidence, when admissible, must be restricted to the trait of character which is in issue, or ought to bear some analogy and reference to the nature of the charge; it being obviously irrelevant and absurd on a charge of stealing to inquire into the prisoner’s loyalty, or on a charge of treason to inquire into his character for honesty in his private dealings. (3 Greenleaf, pp. 31-2.)
The statement of this witness included the appellant, when he had offered no evidence of good character, and was for that reason, if no other, irrelevant, and should not have been admitted. But it is proper to decide whether the evidence was competent as impeaching the testimony of E. M. Young, who had been called to testify for the accused. General evidence affecting his credit for veracity was cex-tainly competent; but in impeaching his credit the examination of witnesses called for that pux-pbse must be confined to his general reputation and xxot to particular facts; because, as is laid down in the authorities, every man is supposed to be capable of supporting his general reputatioxx at any time without notice, bxxt not to answer the other; and uxxless his general character and behavior be in issue, he can not without notice be prepared to meet a special or particular charge.
The regular mode of examining into the general reputation of a witness is to inquire of the witness called to impeach him whether he knows the general reputation *317 of the person in question among his neighbors. If he answers in the affirmative, then he should be asked what that reputation is. (1 Greenleaf, 461.)
The witness Lewis does not state that he knew the general reputation of Frank Young among his neighbors when he was called to testify. He said he .knew him in Harlan County in 1863, and before; t|ie strong inference from which is, that since that period, and among his present neighbors, he did not know his general reputation. But unless he had stated he was acquainted with his character among his neighbors at the time he testified, he should not have been permitted to speak of it; nor should he have been permitted t'o testify to particular acts. And the court erred, to the prejudice of appellant, in overruling his objections to that evidence.
The deceased made a statement to Esquire Powell, the same evening he died, of the occurrences which resulted in the shooting of him, and at the same time stated he did not believe the wound would kill him; which statement the prosecution offered to read as the dying declaration of the deceased. The same was objected to as incompetent by the appellant, but the court admitted the statement; and that ruling of the court is complained of as erroneous.
Before said declarations were offered in evidence, Thomas McHone, the father of the declarant, was examined as a witness, who proved that he was with his son about one hour after he had made the statement to Powell; that he then told him he had made it to Powell, and that it .was true; and that he had said to Powell that he did not think he would die, but that he believed he would die, and believed so when he made the statement to Powell; but he was induced to tell Powell he did not think he would because a man had been shot in the *318 neighborhood some time before that, and detailed the circumstances under which he was shot, and said he believed he would die; that the man got well, and was disgraced; and he did not tell Powell he thought he would die, because it would be a reproach to him if he got well.
By the conversation with his father, decedent reaffirmed the declarations which he had previously made to Powell, and said when he made them to Powell he did believe he would die. This, we think, was sufficient evidence that the declarations were made under a sense of impending death on the part of the declarant to authorize their admission.
A reversal is also asked on the grounds that the instructions given to the jury on the motion of the attorney for the commonwealth were involved, misleading, and erroneous.
It is deemed unnecessary to enter upon a critical analysis of the numerous, long, and somewhat confused instructions given at the instance of the prosecution, but will refer to the controlling and more prominent facts proved on the trial, and state the principles of law applicable thereto.
The deceased had on several occasions, in the presence of different persons, threatened to take the life of the appellant; the threat made at one time at least was communicated to him. What gave rise to these threats does not appear in proof; nor does it appear that the parties had ever been engaged in a personal altercation previous to the difficulty which terminated so fatally. On the evening of the homicide appellant was at home, quietly taking his supper with his own family, when the deceased was seen approaching the house. When first seen he was not recognized by appellant, as he at first said it was his uncle, Thomas Young, and then that it was a Mr. Pendleton, *319 as W. Wilder, a witness for the commonwealth, proves; he came near the house, and appellant then went into the yard, and immediately after leaving the house, without any words having passed between them, deceased fired a pistol at appellant, which he had brought with him. Young then went into the house, met Thomas Young near the door with a gun, and after a short struggle succeeded in getting the gun, and went under a shed, as the witness describes it, near the door, and while there deceased fired his pistol again at him, and Young then shot at him; neither shot took effect. Deceased started back in the direction he had come, cursing appellant and inviting him to follow him. After having gone near a half mile, as deceased was ascending a small hill in the road about one hundred yards in advance of appellant, the latter shot .at him, but missed him, and deceased having passed the summit of the hill was out of sight, and the pursuit then ceased; but appellant remained near a fence, and not far from Wilder’s house. In a very short time after the last shot deceased returned, his father with him, on horseback, both riding the same horse, cursing and halloing, saying to the Youngs, “If you are fighting men, stand up and fight.” Deceased jumped off the horse, with his pistol in his hand, and ran toward the appellant and got on the fence, when, perhaps by the turning of a rail, he let go the fence, and started to the house of Wilder, and was shot by appellant near the door. Whether he had been in the house and was returning, or was approaching to go in, does not very satisfactorily appear; the witnesses differ on that point.
It is perfectly certain that appellant was neither seeking nor expecting a difficulty with the deceased; but quietly at home in the bosom of his family, where he had a legal right to remain unmolested and secure; he was sought by deceased for the purpose, as his conduct proves, of *320 executing his threatened vindictive purpose; and if he had in the first attack fallen by the hand of the man he had so causelessly assailed, it can be scarcely doubted it would have been excusable homicide in Young. But whether, after his adversary had apparently declined to continue the fight and turned to leave, he did not become the assailing party in the succeeding difficulty is the only remaining question.
Jn Phillips v. Commonwealth, 2 Duvall, 328, this court said the principle, applicable to a mutual rencounter or an affray with deadly weapons does not equally apply to such a case as this, in which the first escape from threatened assassination by a determined and persevering enemy might not, and probably would not, secure the ultimate safety of the victim. The law of self-defense is in such a case more comprehensive, conservative, and assuring; and after quoting from 2 Starkie on Evidence, side page 523, says if the principle illustrated in the first part of the extract be sound, must it not be pre-eminently applicable to continued danger to life reasonably and actually comprehended from persistent threats ?
Applying these principles to the present case, if appellant had sufficient reason to comprehend, and did actually comprehend, that McHone would take his life, or that he was in continual danger of losing his life or suffering great bodily harm from him, and that if he returned to his house the attack would be renewed upon him, he had a right to pursue his enemy until he might reasonably believe he was secure from danger. And if, after having-stopped the pursuit, the deceased returned and again assaulted him with deadly weapons, and he had cause to believe, and did actually believe, from his persistent attacks and previous threats, he would take his life or do him great bodily harm, and he slew him after having been *321 assaulted, it was excusable homicide in self-defense. The instructions given to the jury were in conflict with the principles here enunciated, and prejudicial to appellant.
In the fourth instruction too much prominence is given particular facts; and it was erroneous in the court to make the jury the judges of the unfairness or misconduct of the witnesses. If there was such on their part, it was the duty of the court to prevent any unfairness or misconduct, and not substitute the jury as judges in his stead to determine such matters.
Wherefore the judgment is reversed, and the cause remanded for a new trial, and for further proceedings consistent herewith.