## THE PEOPLE v. CHARLES MACARD.

*Criminal law—Homicide—Self-defense—Evidence—Charge to jury.*

1. It is not necessary for a person, if without fault, when suddenly assaulted upon the public highway or upon his own premises, and when an instant's delay may be at the expense of his own life, to retreat before using his weapon.

2. Where the evidence in a homicide case showed that at the time respondent fired the fatal shot the deceased, who had twice threatened to shoot respondent, was approaching him with his gun in his hand, and was only about three rods distant, and was then raising his gun with the avowed purpose of shooting the respondent, and that, go which way he would, respondent would only the more surely expose himself to the threatened danger, about the only question for the jury to determine is, did the respondent in good faith believe this to be his true situation; and if he did, the jury should be instructed that he was fully justified.

3. There is a difference between innocence and *doubtful* innocence, and an instruction to the jury that all of the material facts must be proved beyond a reasonable doubt will not take the place of a charge that the prisoner is presumed to be innocent

until proven guilty, which should be given, although not requested by counsel.

4. An examination of the opinion is essential to a full understanding of the points decided.

Error to Kent. (Montgomery, J.) Argued October 17, 1888. Decided November 28, 1888.

Respondent was convicted of manslaughter, and sentenced to State prison for four years. Reversed. The facts are stated in the opinion.

*John A. Fairfield (Birney Hoyt,* of counsel), for respondent.

*Moses Taggart,* Attorney General, for the people.

[The opinion contains a full statement of the points of counsel.—REPORTER.]

SHERWOOD, C. J. The respondent was charged with killing and murdering Michael O'Hara at the township of Wyoming, in the county of Kent, on August 7, 1887, and was tried in the Kent circuit in October following, and convicted of manslaughter, and sentenced to imprisonment for the period of four years. The respondent asks a review of the case in this Court.

The bill of exceptions does not purport to contain all the evidence in the case. Macard lived neighbor to Mr. O'Hara at the time he was killed. Their houses were but 95 rods apart. Mrs. Macard, the mother of Charles, lived but 60 rods from respondent. For several months previous to the killing, Mr. Macard and O'Hara had had difficulty and been at enmity, and but a few weeks before they had a hostile meeting, and respondent and his brother William were arrested for an assault and battery upon Charles O'Hara, and was placed in jail.

There was evidence tending also to show that on several

occasions the respondent had fired his gun towards the house of O'Hara, and used threatening language; that, on the occasion of the killing, Mr. O'Hara had taken his gun, and gone up into his potato patch to get some potatoes; that the potato field was across the road and opposite Macard's house; that Macard at the time had come from his house into the road, and stood there talking to a neighbor, Mr. McGrain; that about this time O'Hara said to respondent: "I will shoot you; I will stop you stealing my potatoes." O'Hara had then gone near the road or to the fence, and they were then but a few rods apart. While at that place Macard told O'Hara to stand where he was. He, however, continued his course out of the field, when respondent again told him to stand where he was. This O'Hara did not do, but continued his course to the road, and raised his gun as if to shoot, when respondent raised his gun and shot O'Hara, killing him almost instantly.

It was the claim of respondent upon the trial that he killed O'Hara because he was afraid O'Hara would kill him, and that it was in self-defense alone that he shot his antagonist, and that he had reasonable cause for so doing; that O'Hara had repeatedly threatened to kill him and his brother William; that he had on several different occasions shot at his house, and his mother's house, and on the fatal morning had evidently armed himself to carry out his threat against respondent, and came towards him with the avowed purpose of killing respondent; that retreat only exposed him to greater danger; and that he feared delay might prove fatal to respondent, and he therefore used his weapon as his only means of safety. Such were the grounds of respondent's defense; and the theory of his counsel, and all the acts and doings of respondent at the time and after the killing, were not

inconsistent with the defense made, as would appear by the record.

It was the theory of the prosecution that Macard was a turbulent, quarrelsome man; that he had made some threats of a violent character towards O'Hara previous to the unfortunate occurrence, and that it was to gratify his ill-will towards O'Hara that he sought this opportunity, and prepared himself to wreak vengeance upon his enemy.

Such were the theories of the parties, and upon which the cause was tried. Great care was exercised on the part of the learned circuit judge on the trial of the cause.

But two errors are assumed upon the taking of testimony. Witness Ames was examined for the people, and testified, against respondent, that he worked for him the spring before the shooting occurred, and that respondent said to him that he had had about trouble enough with O'Hara; that if he did not quit bothering him, he would blow his old head off, or something like that. Upon cross-examination, after testifying that he asked Robert Frost if he did not tell a man he had heard Macard make threats, he said:

"I have had trouble with Charley. I owe him, and he has dunned me on lots of occasions."

Witness was then asked:

"You owe his mother, don't you, for board, and have owed her for years, and she has tried to get you to pay it?"

This was objected to as not proper cross-examination, and the objection was sustained, and we think properly so. It was proper to show any ill-feeling the witness had towards respondent, and possibly it might have been to show such ill will towards his mother under certain circumstances; but this attempt to show only such circum-

stances between the witness and the mother of respondent from which ill-feeling would not necessarily be presumed, is not only improper cross-examination, but entirely irrelevant.

John Boss was sworn for the people, and testified that he was present soon after the shooting, but did not see Macard fire off the gun. He was recalled on the part of the defense. He had testified that he was a constable, and saw O'Hara in the morning on the day he was killed, and saw him again about 20 minutes before 12 o'clock, going towards the potato field, and he had his gun, and saw him again between 12 and 1 o'clock, dead, on the road-side, and his gun lying beside him; that he lived about 60 rods from there, and about 30 or 40 rods from Macard; that you could see a man at O'Hara's house by looking from Macard's.

On the re-examination he said he told O'Hara not to take his gun when he went over to the potato patch, and that O'Hara said he took it to defend himself with, or something like that; that when the gun was discharged, he was in front of his own house, sitting in a wagon with his children; that he stood up in the wagon and looked, and then sat down again.

Counsel for respondent then asked the witness the following question:

"You got up in the wagon to look. Now, at that time didn't you think that Mr. O'Hara had shot Charles Macard, and have you not stated so to others?"

The question was objected to, and the court sustained the objection. It appeared that the prosecuting attorney had sent a letter to O'Hara warning him against shooting so much, but we think the question was not proper. It was incompetent testimony that was sought to be given. What the constable thought about the matter was of no consequence, and had no bearing upon the issue whatever.

The following are the defendant's first and second requests, which the court did not give:

"1. I charge you that by the undisputed evidence in this case the loaded gun O'Hara had in his hands at the time he was shot was a deadly weapon; and if O'Hara threatened then and there to take the life of Charles Macard, the defendant, or do him great bodily harm, while he held the gun in his hands, and was in a condition to carry his threat into execution, and was approaching the defendant after being ordered by the defendant to desist, and the defendant believed he intended to carry his threats into execution, he was justified in killing O'Hara to repel the assault, and the defendant is not guilty.

"2. The law does not require the necessity of taking human life to be one arising out of actual or imminent danger, in order to excuse the slayer; but he may act upon a belief, arising from appearances which give him reasonable cause for it, that the danger is actual and imminent, although he may turn out to be mistaken. So if you find O'Hara then and there made a threat against the life or person of the defendant while he held in his hands the loaded gun, which I have charged you was a deadly weapon, and the defendant had a belief, arising from the appearances and conduct of O'Hara which gave him reasonable cause for it, that O'Hara was going to kill him or do him great bodily harm, then the defendant was justified in shooting O'Hara; and it would be excusable homicide, and the defendant should be acquitted. In other words, the defendant was justified in acting on the circumstances as they appeared to him, and O'Hara being armed with a deadly weapon clearly makes it a case of excusable homicide."

These requests no doubt state the law correctly as applicable to the facts in this case, and the learned Attorney General concedes this, and claims that the court substantially gave both. The court gave them, but with a qualification, to which counsel for respondent except. In the first the court interpolated, after the word "execution," the following: "*And could not otherwise avoid the assault, as it appeared to him;*" and after the words

"deadly weapon," in the last line but one of the second request, the following:

"If there was no reasonable opportunity or means of avoiding what the respondent anticipated as an assault with this deadly weapon, except by shooting, he had the right to shoot and slay his assailant."

We think the respondent had the right to have these two requests given as requested. The modifications were not of a character to aid the jury in understanding the law contained in the requests as counsel had stated them, and were liable to be misunderstood by the jury. The situation of the parties was undisputed by the evidence at the time the respondent fired his gun. O'Hara had twice on the occasion threatened to shoot Macard, and was approaching him with gun in hand, only about three rods distant, and was then raising it with the avowed purpose of shooting respondent. Go which way he would, he would only the more surely expose himself to the deadly aim of his antagonist. In such case, about the only question for the jury to determine was, did the respondent in good faith believe this to be his true situation? If he did, the jury should have been told the respondent was fully justified. In such a case the law of self-defense says the respondent must judge of what he must and ought to do, and the means he will use in doing it. No jury can ever be allowed to pass upon that question under such circumstances. The only question, then, for the jury is, did the respondent act in good faith, believing his life was in danger? To hold otherwise would be to destroy the right of self-defense.

It was not necessary for the respondent, if without fault, on being suddenly assaulted by the use of a deadly weapon upon the public highway or upon his own premises, to retreat before using his weapon. An instant of delay might have been at the expense of his life, and the

law requires no man to run such risks. *Erwin v. State,* 29 Ohio St. 199; *People v. Anderson,* 2 Wheeler, Crim. Cas. 390; *Haynes v. State,* 17 Ga. 465; *Phillips v. Com.,* 2 Duv. 328; *Young v. Com.,* 6 Bush, 320; *Holloway v. Com.,* 11 Id. 347; 2 Bish. Crim. Law (2d ed.), § 644; *Young v. State,* 11 Humph. 200; *People v. Batchelder,* 27 Cal. 69; *Tweedy v. State,* 5 Iowa, 437; *Temple v. People,* 4 Lans. 119; *Johnson v. State,* 27 Tex. 758; *Long v. State,* 52 Miss. 35; *Hurd v. People,* 25 Mich. 405; *Patten v. People,* 18 Id. 314; 1 Bish. Crim. Law (7th ed.), §§ 844, 850; *State v. Kennedy,* 7 Nev. 374 (Horr. & T. Cas. 137, 139–143); *Pond v. People,* 8 Mich. 150; *Bohannon v. Com.,* 8 Bush, 481. The question of necessity for retreat, or whether the respondent could have avoided the threatened assault, under the circumstances stated, were not for the jury, and should have been omitted, and requests given as prepared by respondent's counsel.

Respondent's third and fourth requests are as follows:

"3. In cases of personal peril, such as this defendant claims he was placed under, the defendant had not only the legal right to defend himself, but the law supposes it to be his duty to defend himself, so far as he has personal capacity, and any serious bodily harm apprehended from a felonious attack would not merely excuse, but justify, extreme resistance; and this defendant should not be required, if hard pressed by O'Hara, to draw very fine distinctions concerning the extent of the injuries the man O'Hara might inflict.

"4. The defendant claims that the attack upon him was so sudden, fierce, and violent that a retreat would not diminish, but increase, his danger. You will therefore ascertain from the proofs the condition of the defendant and his surroundings, his means of getting out of the way of the deceased, so that the man O'Hara could not further assault or shoot him,—whether he would have been able to secure shelter in buildings or woods or other obstructions to be out of the range of O'Hara's gun; always bearing in mind that he was under no obligation, nor was it his duty, to protect himself from the

assault by shielding himself with McGrain or his horse, for the law does not warrant a person when hotly assailed, under circumstances indicating an intent to take human life or do grievous bodily harm, to withhold measures proper in self-defense, and expose others to the same danger; and if you find, as claimed by defendant, he had no means of escape except to enter his own house, and in so doing it would expose him to the range of O'Hara's gun, and the circumstances appeared to him that in so doing he would be shot, it was his right to defend himself; and if, in doing so, O'Hara was killed, the homicide is excusable, and the defendant should be acquitted."

It is hardly necessary to say, after the views expressed, that these requests should have been given. Very much of what is contained therein was given by the court; but in view of the testimony in the case the entire requests were proper, and when such is the case, especially in criminal cases, the requests are reasonable, and it is better that they should be given, unless the number is unreasonably large, or the requests are unnecessarily prolix. I think the last of these requests should have been given. According to the undisputed testimony the only objects which could have afforded the respondent shelter in case O'Hara had discharged his gun at him would have been Mr. McGrain and his horse, near which the respondent stood when he fired his gun, and the request undoubtedly states the law correctly. A portion of this request, that relating to McGrain and his horse, was not given at all. This was error. *People v. Lilly,* 38 Mich. 270; *Brownell v. People,* Id. 736.

The respondent's fifth and sixth requests are as follows:

"5. If you find that the assault by O'Hara upon the defendant was fierce, violent, and sudden, and was not caused by anything that the defendant had done, and the defendant was justified in repelling it, even to taking the life of O'Hara, it will be unnecessary to inquire what ill feeling or malice was entertained by the defendant

towards O'Hara; for if a person is assailed in a violent, fierce, and sudden manner, so that the only way left is for him to slay his antagonist, then it is wholly immaterial what ill will or malice he may entertain towards him, if he contributed nothing to the attack, or in any manner caused it, for the malice and ill will, if any existed, are wholly swallowed up in the defense of life and limb.

" 6. On the other branch of the case, viz., that the defendant armed himself, intending to kill O'Hara on the first pretext or assault and took advantage of an attack that he might do so, I instruct you that that must be proven by the prosecution beyond a reasonable doubt, like any other material fact in the case. But I further charge you that if you find that O'Hara had, previous to the time he was shot, made threats of taking the life of the defendant, and these threats had come to the knowledge of the defendant, and he had just grounds for believing, and did believe, O'Hara would kill him, or do him great bodily harm, then the defendant was justified in arming himself with any weapon that would enable him to repel an assault from O'Hara, and he was not obliged to remain shut up in his house to avoid an assault, but had a right to go about his business; and if he kept within his own legitimate every-day avocations, and gave O'Hara no cause for offense, then, if O'Hara assaulted him with a loaded gun, the defendant had a right to defend himself with any weapon he had secured for that purpose; and if he used no more force than was necessary to repel the assault, then, if he was obliged to kill O'Hara, the homicide would be excusable, and your verdict should be not guilty."

In regard to the first of these two requests, it was proper, and should have been given. It is true, the court said to the jury:

" I charge you that if you find as a matter of fact, upon the whole evidence, that this shooting was done in self-defense by the respondent, then the state of feeling which existed between the parties theretofore would become wholly immaterial."

But the court instructed the jury to consider the former state of feeling in ascertaining whether the right to do what respondent did existed, in ascertaining whether or not he did it in self-defense; and if respondent had malice

towards O'Hara, then he was guilty of murder, notwith-standing the circumstances might be such as to make shooting in self-defense a necessity by respondent to save his own life. The facts stated in the request show such a state of facts as would render the criminal act complained of, under the rule of self-defense, fully justified, independently of any ill will or malice existing in the case, and it was claimed by respondent such were the facts in his case, and this made the request proper to be given, if there was any evidence upon the subject.

It is claimed by the Attorney General that there was no evidence that the attack was fierce and violent, nor that O'Hara threatened to kill respondent. We think an inspection of the record shows quite otherwise. Two witnesses testify to the threat of killing, and of O'Hara's persistent approach until within three rods of respondent, —one, that he raised his gun with the avowed purpose to shoot when he was ordered to stand, and was himself killed by his antagonist while in that position and under those circumstances. It is difficult to conceive of violence more dangerous, or a fierceness requiring more decisive and vigorous means to subdue.

In regard to the sixth request, the court, as in the case of the others, gave a large portion of it, deemed quite as important by respondent. It is claimed to have been given in substance by the prosecution. We think the respondent entitled to it all in the form he asked to have it submitted. It states the law correctly. If such were not the rule, the lives and property of individuals would soon become of little value, and would be at the mercy of the lawless.

I do not think the case was one for the direction of the court, and the respondent's seventh request was properly overruled.

The court should have charged the jury that the respond-

ent was presumed to be innocent until proved guilty. It is claimed that the court charged that the jury must find that all the material facts were proved beyond a reasonable doubt, and that should be held sufficient. There is a difference between innocence and doubtful innocence. Neither, it is true, will allow a conviction, but the presumption abides with the accused from the beginning, and is alone a sufficient defense until overthrown by proof. This is not the impression with many who are called to act as jurors, as I presume has been found to be the experience of most trial lawyers; but the fact that a person has been brought to the bar of the court charged with crime, and asked to answer, causes him not unfrequently to be regarded by the average juror from the first with suspicion amounting almost to a presumption of guilt, and hence the necessity for the charge omitted in this case. It should have been given by the court, although no request therefor was made by counsel. It is the court's duty, in every criminal case, to see to it that the prisoner has a fair trial.

Several exceptions taken relate to portions of the charge as to what elements enter into the crime of murder, and with what intent and what degree of malice the killing must have been done, in order to convict, but inasmuch as respondent was only found guilty of manslaughter it is unnecessary to consider those exceptions.

Aside from the suggestions herein made, the charge was full and correct, but for the errors pointed out the judgment must be reversed, and a new trial granted.

The other Justices concurred.