Temple *v.* The People.

JOHN TEMPLE, Plaintiff in Error, *v.* THE PEOPLE, &c., Defendants in Error.

(GENERAL TERM, FOURTH DEPARTMENT, MARCH, 1871.)

On the trial of a prisoner charged, as principal in the second degree, with aiding and abetting in the murder of one of several who were seeking to obtain entrance at night into the dwelling of one U. (the principal in the first degree), where the prisoner was lawfully entitled to aid in protecting the premises, the theory of the defence being justification, — *Held*, that he was entitled to the benefit of his own testimony to the effect that he had heard that persons had been at the house a short time previous to the killing, and taken U. out in the night and done him violence, as tending, in connection with other testimony of a similar purport, to show the intent with which he had aided and abetted in the killing.

Whether a conviction, upon an indictment charging the prisoner with aiding and abetting in the crime, can be had of a principal in the second degree, where the principal in the first degree cannot be convicted, *quere.*

It seems, in such case, the indictment should properly charge the prisoner as principal.

THIS was a writ of error to the Orleans county Oyer and Terminer.

The plaintiff in error was indicted and tried at the January term in 1871, upon a plea of not guilty to an indictment which charged that one John Utley did, at, &c., feloniously shoot and kill one William Thomas Hudson, and that the plaintiff in error, feloniously, &c., was present, aiding and abetting and assisting the said John Utley in the commission of such felony; and it proceeded further to charge "that the said John Utley and John Temple, the said William Hudson, in manner and form aforesaid, then and there feloniously, willfully, and of malice aforethought, did kill and murder, against the peace of the people of the State of New York and their dignity, and contrary to the form of the statute in such case made and provided." The indictment contained also a count charging the plaintiff in error as accessory before the fact.

The plaintiff in error demanded a separate trial. It was the theory of the defence that the killing was justifiable; and upon the trial the following facts appeared in evidence:

On the 9th November, 1870, between one and three o'clock A. M., Hudson, the deceased, in company with ten others, went to the house of Utley, situated several miles from the town of Albion, on the Eagle Harbor and Waterport highway, and standing back from the road some thirty-six feet. Hudson and Temple, the prisoner, were employed as blacksmiths in the same shop, and the former, who was, with his companions that night, at Albion, proposed to the party that they should go to Utley's for the purpose of finding Temple there, and having a laugh afterward at his expense. They went in buggies, and, upon approaching the house, Hudson and two others with him in the same buggy were in advance, and came first upon the premises. Hudson and one Hinchey got down from the wagon in which they were, with one Smith also, and went first to the rear door of the house and rapped upon it, but received no answer. Hudson then went toward the front door, followed at a distance by Hinchey, and rapped upon it, when it opened, and a shot was immediately fired from within by Utley, which entered Hudson's breast, and caused his death in a few days after. The evidence was contradictory as to whether Hudson had put his hand upon the latch and opened the door, or whether it had been opened from within. There was also a discrepancy in the testimony upon the question whether the deceased had not leaned into the house at the door before the shot was fired.

The party had been drinking somewhat before reaching the house; but the tendency of the testimony was to show that none of them were intoxicated, and that they were not excessively boisterous or noisy. Utley, his wife and two children, the prisoner Temple, a daughter of Utley's wife, and a young man named Edgar, were within the house, and were up and dressed when the party came. They were heard from within approaching upon the road near a neighboring house and exclaiming, "The next house, boys!" Directly before knocking at the front door, and on his way there from the rear of the house, Hudson had thrown a stone at a dog which came out upon him, and thereupon said that he would make no more

Temple *v.* The People.

noise, and the "yelping of the dog was also heard within," as also the rapping at the doors, but there was no other disturbance shown, and Hudson and Hinchey were the only ones of the party who got out of their wagons and within the inclosure before the shooting. Utley and the prisoner went to the front door on the approach of the party to the house, Utley having the gun in his hands; and when the knocking at that door took place, the prisoner was heard to tell Utley to shoot, and immediately after Utley fired the shot. The prisoner also directed Utley to reload immediately after the discharge, and at the same time took the gun into his own hands and reloaded it.

The prisoner testified that he had heard at a tavern, on the evening preceding the night of the killing, that there were persons going that night to Utley's for the purpose of "going through the house" and "raising the devil in it." It had also appeared that the prisoner had told Utley the same evening that a gang was coming to go through the house, and that Utley had told the prisoner that a gang had been there, through the house, and he once had his head most broken by them, and did not want to get hurt again; and the prisoner's counsel offered to prove by the prisoner " that he had heard that persons had been at the house shortly previous, and had made disturbance and taken the old man Utley out in the night-time and beaten him severely, for the purpose of showing that the prisoner had ground for apprehensions." To this testimony the counsel for the people objected, and the court refused to allow it to be given, and the prisoner excepted.

The jury found the prisoner guilty of murder in the first degree, and he thereupon sued out this writ of error.

*J. M. Thompson* and *George Ballard*, for the plaintiff in error.

*H. A. Childs*, district attorney, and *John H. White*, for the defendant in error.

Present—MULLIN, P. J., JOHNSON and TALCOTT, JJ.

MULLIN, P. J.  Utley, who fired the gun by which Hudson was killed, and the plaintiff in error, who was present, aiding and abetting Utley in the killing, were guilty of murder in the first degree, unless the killing was justifiable, or unless it was manslaughter in some of its degrees.

Utley was the principal in the first degree, having been the actual perpetrator of the crime.  Temple was a principal in the second degree, having been present, aiding and abetting, at its commission.  (1 Chitty's Crim. Law, 256.)

The important question presented for our consideration in this case is: Was the killing justifiable as to the plaintiff in error?

The Revised Statutes (vol. 3, 5th ed., p. 939, § 3), specify the cases in which the killing of a human being is justifiable. These are:

1st. When committed in resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling-house in which such person shall be; or,

2d. When committed in the lawful defence of such person, or of his or her husband and wife, parent, child, master, mistress, or servant, when there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished; or,

3d. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or lawfully suppressing any riot, or in lawfully keeping and preserving the peace.

I do not think there was any evidence before the jury that would authorize them to find that the deceased and those who were acting with him intended to murder the prisoner or commit any felony upon him.  No such purpose was indicated in the statements made by some of them as to the object of their visit to Utley's on the night of the killing; nor was there anything in the language or acts at the house indicating any such intent.

Temple v. The People.

But there was evidence, competent to be considered by the jury, upon the question whether or not the deceased was killed while the prisoner was resisting an attempt to commit a felony on the house of Utley, on the night in question.

The only felonies that can be committed on a house are arson and burglary.

There is no reason to suppose that the deceased and those who were with him had any intention to burn the house. The inquiry is, then, reduced to this: Had the prisoner reason to believe, and did he believe, that it was the purpose of those who came to Utley's that night to commit the crime of burglary, and was the prisoner resisting an attempt of the deceased to commit that crime when he killed him?

Burglary, in general terms, consists in breaking into or out of a dwelling-house, with intent to commit a crime. Breaking alone, without the intent, does not constitute burglary. A *"crime"* is defined in the Revised Statutes (vol. 3, 5th ed., p. 990, § 43) as *any offence* for which *any criminal punishment* may be inflicted. Burglary may, therefore, be defined to be the breaking into a dwelling-house with intent to commit any offence for which any criminal punishment may be inflicted.

The witnesses Graves and Raymond swear that the deceased, after rapping at the front door, opened it and leaned in; while the witness Smith testifies that deceased did not open the door nor lean in. One or two other witnesses say the door was opened, but they do not seem to know by whom. The prisoner says the door was opened, but does not say by whom. It is not pretended that the prisoner opened it. He was standing behind Utley when the door was opened and the gun fired. Who had he reason to believe, under the circumstances, opened the door? He had heard of the threat that a mob was coming to clean out the house; they tried to get in at the back door and failed, then rapped at the front door. No answer was given. If the mob had any business to do inside of the house, it would be quite probable that they, and not those within, opened the door. If the deceased opened the

door, it was a breaking, and formed an element in the crime of burglary.

Was the breaking with intent to commit a crime in the house? The persons collected at Utley's on that occasion went, as they claimed, to find the prisoner there, and have fun at his expense the next day. To qualify themselves for the fun, some of them drank three or four times at Thurber's, in Gaines, and, as the witness who sold the liquor thinks, some of them were intoxicated. Hinchey says he drank at Albion, but cannot tell the number of times; can't say as the others drank, but he treated. One or two others of the number say they did not drink, and several others that none of them were drunk; on the contrary, they were quiet and orderly. Such unlawful assemblages are, I believe, always presumed by those who compose them to be made up of persons of temperate habits and models of order and of obedience to the laws. But it is an unfortunate manifestation of their virtues to commence operations by breathing "threatenings and slaughter" against persons who have done them no injury, with whom or whose property they have no right to interfere. One or two o'clock in the night is a somewhat unusual hour for such respectable people to be found assailing the house of a neighbor in which are women and children, who are, by all civilized people, deemed entitled to protection against violence, rather than made the victims of it, although their conduct and character may not be entirely in accordance with the religious or moral principles of such pious reformers.

The law is yet able to punish those who keep houses of bad repute, and it neither needs nor asks the aid of midnight marauders in discharging its duty, and they must not be surprised if even the vicious will occasionally resist violence toward their persons or property by killing the wrong-doer.

If young men will, in violation of law, enter upon midnight expeditions with the view to get plunder or commit violence on their neighbors, they must not be surprised if they are met with the same lawless spirit which prompts them to action,

and, if they are murdered, they have no claim on the sym pathy of respectable citizens.

I would not utter a word in justification, or even in miti·gation, of the conduct of those who take life under such circumstances, even in vindication of their rights of person and property, unless it is done under such circumstances that the law declares it to be justified. Nor would I mitigate, in the slightest degree, the criminality of those who provoked violence and bloodshed, in their attempts to gratify their pas-sions when excited by liquor, or display their courage by playing on the fears of defenceless women and children, or counsel violence on those who are unarmed or unable to defend themselves.

The mob, when at the house, had no weapons; they used no violence; they uttered no threats. So far as their conduct at the time of the approach to the house was concerned, there was no evidence of intended violence. But the court admit-ted proof that Utley said, as I understand the evidence, on the hearing, of the prisoner, that a gang had been there, and had gone through the house, and he had his head most broken once, and did not want to get it hurt again, and had been out to the corn-field husking to be away. The prisoner testified that he had heard that day, at Eagle Harbor, one say that persons were going to Utley's to raise the devil that night. Clark testified that the prisoner came to Utley's and told him (Utley) that a gang was coming out that night to raise hell. Black testifies to the same fact.

The gang that was promised did come at one or two o'clock in the morning, and attempted to enter the house.

With what purpose did they attempt to enter? It was, as the prisoner and Utley were informed, to clean out the house, or to raise the devil or raise hell in it. A short time before a similar mob had been there and committed violence on the person of Utley. These threats and acts were known to the prisoner. He was there, at the request of Utley, for the pur-pose of defending him and his house. He was lawfully there, and had the right to defend it to the extent of taking life, if

it was necessary to prevent the commission of a felony therein.

If, upon the evidence, the jury should find that the deceased did open the door with the intention of committing violence on the persons of any of its inmates, the justification was complete. Because the two things thus proved constituted a breaking of the house, with the intent to commit a crime therein.

The jury have found against the prisoner; and we must presume that they found either there was no breaking, or there was no intention to commit a crime in the house. And this would be conclusive, and put an end to the investigation, were it not for the rejection of certain evidence offered on the part of the prisoner, which, it is claimed, might, if received, have authorized the jury to arrive at a conclusion different from that evidenced by their verdict.

The offer was to prove by the prisoner himself that he had heard that persons had been at the house shortly previous, and had made disturbance, and had taken the old man Utley out in the night-time and beaten him severely.

The offer was made for the purpose, as stated by the prisoner's counsel, of showing that he (the prisoner) had grounds for apprehension.

This evidence was objected to by the district attorney, and rejected.

As the evidence offered was neither objected to nor rejected on the ground that it was the transaction that had been already proved in the case, we must assume it was another and different one.

The fact to be proved, in addition to breaking into the house, was, that it was done with the intent to commit a crime therein. Had the evidence offered any tendency to prove such an intent? The question is not whether such intent actually existed in the minds of the rioters, or of any of them; but, would the evidence offered, together with the other evidence in the case, have a tendency to prove that the prisoner had reason to believe, and did believe, that the inten-

Temple *v.* The People.

tion was to do violence to Utley or any person in the house If it had, it was competent; if not, it was properly rejected.

In *The People* v. *Rector* (19 Wend., 569), the prisoner's counsel offered to prove that, a week previous to the homicide, persons had broken into his house, and threatened to return again some other night and break in again. The evidence was rejected; but, on error, the judgment against the prisoner was reversed, on this and other grounds; COWEN and NELSON, JJ., being for reversal; BRONSON, J., dissented, holding the evidence inadmissible.

I entertain no doubt of the competency of this species of evidence. When an assault is made on the person, or upon the house in which an individual lives, he must decide upon the nature and degree of resistance he is called on to make, not only from the kind and degree of violence with which he is assailed, but also by what he knows or has heard of the intention of the assailant.

If a person is informed that, at a specified time and place, he will be assaulted by another, armed with a dangerous weapon, what is it natural and proper for him to do? Is he to disregard the warning, and expose himself, without taking any precautions or using any means to resist the assailant? He may keep away from the place indicated, but he cannot be certain the one who has threatened violence may not follow him and execute his threat. Is a man to disregard such a warning, and taking no measures for defence, because he has not had the information from the person who threatens him? All men act, and, from the very necessity of the case, must act, in the protection of life and property, not only upon what they know, but what is communicated to them by others, as to violence contemplated toward them. If a police officer should ascertain from one of a gang of burglars that a house is to be broken into on a particular night, and he communicates the information to the occupant, must the latter wait until the burglar is in the very act of breaking the house before he can arm himself to resist; or, being armed, must he wait until the

burglar is in possession of his goods, before he can use the weapons with which he has armed himself?

The killing is justified if done while the person killed is *attempting* to commit the felony. It is not necessary to wait until it is committed. The offer in the case at bar was not to show a threat by a mob to return and commit violence on the prisoner or his property, made to him or in his hearing; but it is to prove that some one told the prisoner that a mob had committed violence on the person of Utley on a former occasion.

It is not claimed that the evidence offered would not have been competent if the witness was personally acquainted with the facts; but it was, as to the prisoner, mere hearsay.

The general rule is, that facts communicated to a witness by others (or hearsay evidence, as it is called), is not competent. But there are exceptions to the rule; and I am of the opinion that the evidence offered is within one of the exceptions.

I have suggested some reasons why the proper protection of life and property requires the admission of such evidence; and there is authority justifying its admission.

In *Selfridge's Case,* which is reported by Wheaton, in his work on homicide, and referred to in note to section 1026 of his work on criminal law, evidence was received on behalf of the prisoner, without objection, as it would seem, that he was informed, the day before the killing, that he would be assaulted by the deceased. Wheaton, in the note referred to, expresses his surprise that such evidence was admitted. But to me it would be surprising had it been rejected. It would be madness in a man not to arm himself after such information; and he had the right to regulate his conduct toward the assailant, in view of it.

Wheaton, in his Criminal Law (§ 663), says, when it becomes a subject of inquiry whether a person acted *bona fide* prudently or wisely, the information and circumstances on the faith of which he acted, whether true or false, are original and material evidence. This rule reaches and embraces the evidence offered in this case. Wheaton says this rule is often

illustrated in actions for malicious prosecution, and also in cases of agency and trust.

An attorney is authorized to discharge debts due his principal, and, in pursuance of the power, release a debt due from a solvent debtor. When sued for the wrongful act, he is permitted, under the foregoing rule, to prove that, before releasing it, he was informed that the debtor was a bankrupt, and, in pursuance of that information, and relying on its truth, he released the debt.

Can it be possible that such evidence is competent in a case where ten dollars is involved, and not admissible when the life of a man is at stake?

In *Cornelius* v. *The Commonwealth* (15 B. Monr., 539), the prisoner proved threats, on the part of the person killed, to kill him, which threats had been communicated to him. He then offered to prove other threats, not communicated, which was held incompetent on the trial. But, on error, the evidence was held competent, and the conviction was reversed.

Such evidence is concededly competent to show the intent of the deceased in making the assault. But how is his intent material, unless it is known to the one who kills him? Evidence of threats by the assailant is properly admissible in favor of the prisoner, because they were calculated to influence his conduct toward the assailant. Proof of the intent of the deceased is admissible, because it justifies the prisoner in resorting to extreme measures, when, without such proof, he would be bound to wait until the felonious designs of the assailant were more clearly manifested.

Wharton on Criminal Law (§ 641), says, when it is shown that defendant was under reasonable fear of his life from the deceased, the latter's temper, in connection with previous threats, &c., is sufficiently part of the *res gestæ* to give in evidence as explanatory of the state of defence in which defendant placed himself. Wharton on Homicide, 215–220, is cited in support of the position.

When the threats must be made, to be admissible under this rule, is not stated. If they were made near the time of

the homicide, they would be admissible as part of the *res gestæ* under the well-established rules of evidence. But if, in such cases, threats made within any reasonable time before the killing are to be treated as part of the *res gestæ*, in order to enable the prisoner to show all the facts and circumstances which influenced his action at the time of the killing, then this evidence would be a part of the *res gestæ* within the rule. (See, also, *Reynolds* v. *The People*, 17 Abb., 413; *People* v. *Lamb*, 2 Abb., N. S., 148.)

There is still another ground on which this evidence is admissible.

If Utley was on trial for the murder of Hudson, it would be competent, within the principle decided in *The People* v. *Rector* (*supra*), to prove the previous outrage on his person, which the prisoner offered to prove; although there was no proof, or offer to prove, that the persons at the house on the night of the killing were the same as were there on the former occasion. If admissible for Utley, it surely was admissible in favor of the prisoner, who was aiding and abetting him, at his (U.'s) request. If not, then the anomaly would be presented of the principal offender being acquitted, as justified in killing the deceased, while the aider and abettor is convicted of murder and hanged. If the principal in the first degree was the innocent instrument of the principal in the second degree, there would be some propriety in acquitting the one and convicting the other. But Utley has no such excuse. He was the active agent in the killing; and, if he is justified, so is his aider and abettor. At least, evidence which is admissible in favor of the one, must be admissible in favor of the other.

The case of *Regina* v. *Tyler and Price* (8 Car. & P., 616) not only sustains this view of the case, but goes much farther; holding that, if Utley was not guilty of murder, the defendants are entitled to an acquittal upon the indictment for aiding and abetting. If indicted for murder, they might be convicted, even if the principal in the first degree should be acquitted, but not when indicted for aiding and abetting. In

Temple v. The People.

the case cited, the defendants were indicted as aiders and abet-
tors of the man who committed the homicide.  On the trial,
it was shown that he was insane, and it was held that the
defendants could not be convicted as aiders and abettors, but
could be on a count for murder.  This is the only case that
lays down such a proposition; but there are at least plausible
reasons in its support.  A person cannot be an aider and
abettor of a crime that the one who actually perpetrates it can-
not, in law or in fact, commit.  A madman cannot commit a
crime; how, then, can it be said that another aids and abets
him in committing it?  The principal in the second degree
must be indicted as principal in such case, but not as aider
and abettor.

We do not wish to be understood as deciding that the
prisoner cannot be convicted upon the indictment for aiding
and abetting Utley in the killing of Hudson.  We express no
opinion on that question.  We refer to the case of *Reg.* v.
*Tyler and Price* for the sole purpose of showing the extent
to which an eminent judge has gone in extending the same
protection to the aider and abettor in homicide as the law
affords to the principal.  On another trial this question can
be considered, should counsel deem it worthy of considera-
tion.  It was not suggested on the argument before us, and
could not, therefore, be passed upon by us.

In the case of *The King* v. *Whitehead* (1 C. & P., 67), the
defendant was indicted for defrauding the prosecutor by falsely
representing the value and number of certain livings that one
Brown sold to the prosecutor; and he was permitted to prove,
by letters passing between himself and Brown, that the repre-
sentations were honestly made, Brown having made the same
representations to him in said letters, by which representations
he was himself deceived.

This evidence was received as part of the *res gestæ*, proba-
bly.  But, as the very inquiry was, whether the defendant
made the representations in good faith or fraudulently, any
evidence legitimately bearing on that issue was competent.
It was admissible on the same principle that information

derived from third persons is admissible in actions against agents, &c., above stated.

I cannot, after a careful and extended examination of the authorities, resist the conclusion that the evidence offered was competent. It was due to the prisoner that the jury should have before them all the facts and circumstances known to him, that were calculated to, and would, naturally influence him in determining the question whether he was in personal danger, or whether the design of the mob was to commit a crime in Utley's house. Without such evidence the jury could not appreciate his feelings or motives; and, failing in that, they could not do him justice. The weight which ought to be given to the evidence, when admitted, may be very little; but to that little the prisoner had the right, and it was erroneous to deprive him of it.

The other exceptions in the case present no question requiring consideration.

The judgment must be reversed, and new trial ordered in the Orleans Oyer and Terminer, to which the proceedings are remitted.

Judgment reversed.