CASE 13—INDICTMENT—DECEMBER 19.

# Bohannon v. Commonwealth.

APPEAL FROM SHELBY CIRCUIT COURT.

8b 481
89    83
8b  481
95    34
8bu 481
e109 656

1. SELF-DEFENSE—MALICE AFORETHOUGHT—THREATS—ERRONEOUS INSTRUCTIONS AS TO.

   In a prosecution for murder, where the defendant relies upon the plea of self-defense, it is error to instruct that malice aforethought means a predetermination to kill, however suddenly formed in the mind of the person killing.

   To constitute murder the killing must be unlawful as well as predetermined.

2. The law of self-defense does not require one whose life has been threatened to leave his home or to secrete himself to avoid his foe. It is therefore error, in such a case, to instruct that the right of self-defense does not arise until the defendant has "done *everything* in his power to avoid the necessity" of slaying such foe.

3. FEAR GROUNDED UPON THREATS, OR UPON INFORMATION THAT ONE LIES IN WAIT, will not justify the party so threatened or endangered in killing his antagonist, unless the threats or lying in wait have been accompanied by an actual attempt to kill or to commit some other known felony; and not then unless the person so circumstanced believes, and has reasonable ground to believe, that the presence of his enemy puts his life in imminent peril, and that he can escape such peril in no other way.

VOL. VIII.—32

4. One whose life has been threatened, and who has been attacked with a deadly weapon, may arm himself to resist his foe; may leave his home for any legitimate purpose, and if he casually meets such foe, having good reason to believe him to be armed and ready to execute his threats, and that *his* personal safety can be secured in no other way, he need not wait to be assaulted, but may secure himself from the impending danger even by killing his adversary, if it be necessary to do so.

5. The opinion in Phillips v. Commonwealth (2 Duvall, 331) is reaffirmed in so far as it conforms to the views of the law of self-defense as expressed in the opinion in this case.

6. The opinion in Carico v. Commonwealth (7 Bush, 124) held not to be binding authority upon the law of self-defense, as it merely expresses the opinion of one judge upon that branch of the law.

P. U. MAJOR,    .  .⎫
—— ROBINSON,    . ⎬ . . . . . . . . . For Appellant.
J. P. FOREE,    . .⎭

(Briefs of Appellant's counsel have been lost or misplaced.)

JOHN RODMAN, Attorney-General, . . . . For Appellee,

CITED

Hawkins's Pleas of the Crown, section 22, chapter 28.
Roscoe's Criminal Evidence, 764.
17 B. Monroe, ——, Adwell v. Commonwealth.
14 B. Monroe, 501, Rapp v. Commonwealth.
18 B. Monroe, 54, Meredith v. Commonwealth.
2 Metcalfe, ——, Burns v. Commonwealth.
1 Metcalfe, 376, Payne v. Commonwealth.
2 Duvall, 331, Phillips v. Commonwealth.
4 Blackstone's Commentaries, 184, 185.

JUDGE LINDSAY DELIVERED THE OPINION OF THE COURT.

At the September term, 1871, of the Shelby Circuit Court Hiram Bohannon was indicted, tried, and convicted for the murder of Addison Cook. His motion for a new trial was overruled, and from the judgment of that court, sentencing him to be hung, he prosecutes this appeal.

The deceased is shown by the evidence to have been a man of lawless habits, overbearing, revengeful, and vindictive, and resolute and determined in the execution of his plans

of vengeance against those who incurred his hostility. The testimony also conduces to show that he was at the head of a secret organization which habitually set the laws of the commonwealth at open defiance, and the members of which, under the pretense of inflicting punishment upon criminals who could not be reached by the process of the law, were themselves guilty of the commission of both penal and criminal offenses.

Several months before his death, for reasons not fully explained, Cook became the avowed enemy of the appellant. He more than once openly threatened to take his life. Of these threats Bohannon was informed. On the Saturday before the killing, which took place on Tuesday, the 15th day of August, 1871, Cook, in company with one Penn, and evidently in the execution of a preconcerted plan, with a drawn pistol attacked Bohannon upon the public highway, and the latter only succeeded in escaping assassination by deserting his horse, and concealing himself in the fields adjacent to the road. The assailants then pursued the witness Blakely and his wife, who were in company with Bohannon, and who resided at his house; and when they had overtaken them Cook compelled Mrs. Blakely to retract certain statements she had made relative to his being the chief of a lawless organization known as Ku-klux, threatening her with immediate death in case she refused to make the required retraction. He then announced to Mrs. Blakely and her husband that he intended to kill Bohannon on sight.

This threat they communicated to Bohannon that night. They also gave him a detailed statement of Cook's conduct at the time it was made.

On the morning of the killing, and but a short time before it took place, Cook asked a witness named Hamilton whether he could not frame some excuse for going to Bohannon's house, and ascertaining his whereabouts, stating that he was anxious to ascertain that fact.

On that morning Bohannon left his house, so far as the evidence shows, for the first time after he was attacked on the Saturday before. He took with him a double-barreled shotgun. The deceased and the appellant met in the railroad cut near the village of Bagdad. Two shots were heard in quick succession. No one saw the rencounter. Cook was found a few minutes afterward lying dead on the side of the railroad track, with a revolving pistol in his pocket, about half way out. The shot had taken effect in the back of his head and neck, and in his body between the shoulders. Bohannon was seen coming from the spot where the shooting was done, and in reply to a question said that "he had shot a thief, who had run him out of the road a few days before, but that he would not run anybody else out of the road again."

Upon these facts the court gave the jury a series of carefully prepared instructions, eleven in number, and refused all that were asked by Bohannon. It is complained that several of the instructions given are erroneous, and that taken together they were misleading, and prejudicial to the substantial rights of the appellant.

By the first instruction the jury were told that "by the term malice aforethought is meant a predetermination to kill, however suddenly or recently formed in the mind of the person killing before the fatal act, so that the determination actually exists in the mind before and at the time of the killing, and be not prompted alone by the first transport of passion and under great provocation." If the plea of self-defense had not been relied on, and the sole effort of the appellant had been to reduce the killing from murder to manslaughter, this definition might not have been calculated to prejudice his rights; but standing as it does without any subsequent modification or explanation, it is in effect a determination by the court that killing in necessary self-defense of one's person or property may be killing with malice aforethought, and there-

fore legally murder. A killing to constitute murder must be done unlawfully, and unless it be unlawful it can not have been done with malice aforethought, although it may have been predetermined.

A party upon whom a murderous assault is made, when there are no other apparent means of escape, may determine to defend himself without attempting to flee, and if necessary to kill his assailant; and if, pursuant to this predetermination suddenly formed, he does kill, it will be neither a malicious nor unlawful but an excusable homicide. (3 Greenleaf's Evidence, section 550; 1 East's P. C. 271.)

By the seventh instruction the jury were told that "the right of self-defense is founded on necessity, and can not be exercised in any case or to any degree not necessary. No instrument or power beyond what is necessary is to be used; *and when one expects to be attacked his right to defend himself does not arise until he has done everything in his power to avoid the necessity.* Human life can not be taken by way of personal defense only in extreme or apparently extreme necessity. But when the attack is made with felonious intent against the person the party attacked is not bound to flee. , . . When a known felony is manifestly about to be committed upon the person of a man by violence or surprise he is not bound to flee; but may even pursue his adversary until he is out of danger, but no further, and if death result in the conflict he will be guiltless. . . . . So if it was manifest that *decedent* was about to commit one of these felonies (murder, manslaughter, or malicious wounding) by violence or surprise upon the person of defendant, and he shot *decedent* solely to prevent the commission of such felony, he shot justifiably, and was not bound to attempt to escape by retreat or otherwise."

The eleventh instruction is in these words: "You can not acquit the defendant on account of mere threats made by *decedent* against the defendant, unless you believe from the

evidence that at the time he fired the fatal shot, if he did fire
it, the *decedent* was making some demonstration from which
the defendant had reasonable grounds to believe that the
*decedent* was then about to put his threats into execution by
killing defendant, or inflicting upon him some great bodily
harm."

It was misleading to instruct the jury, under the proof in
this prosecution, that Bohannon's right of self-defense did not
arise until he had "*done everything in his power to avoid the
necessity*" of slaying his adversary. He might have avoided
such necessity by secreting himself so that he could not be
found, or by abandoning his home and seeking safety in some
remote part of the country; but under the law he was not
required to resort to either of these methods of securing his
personal safety.

Instruction No. 11 will be considered in conjunction with
others given by the court after the submission of the case to
the jury.

After considering the case for some considerable time, at
their own request they were conducted into court by the
sheriff, and inquired of the court: "Whether to exonerate
the defendant from guilt on account of the killing they must
confine themselves to the time of the killing, and disregard all
danger that formerly existed, all danger in the future, and all
previous threats?"

The court instructed, in answer to this question:

1. "That they can not acquit the defendant on account of
any danger, real or apparent, not existing, or not on reasonable
grounds believed by the defendant to exist, *and to be about
then to fall upon him, at the time of the killing.*"

2. "They should not disregard previous threats, but should
regard and weigh them so far as they may shed light on the
question as to the real or apparent danger defendant was in
at the time he did the killing, if he did it; and also as to

whether he did the killing with malice aforethought or without malice."

3. "The jury asking whether they are to regard only the circumstances occurring immediately at the killing, and to disregard all other testimony in the case, are instructed that they are to regard and weigh all the testimony in the case."

The first of these three instructions is in direct conflict with the law of self-defense, as laid down by this court in the case of Phillips, 2 Duvall, 328, and also in the case of Young, 6 Bush, 312.

The first of these cases has been the subject of much criticism, not so much on account of the conclusions of the court on the point actually decided as of the argument of the writer in support of these conclusions. This argument is merely dictum, not entitled to be regarded as authority, and valuable only to the extent it accords with the reason of the law of self-defense.

We adhere to the ruling of the court in that case in so far as it was decided that the principle of self-defense does not equally apply in cases of mutual rencounters or affrays with deadly weapons, and one like this, where the life of the accused has been threatened by a lawless, determined, and vindictive enemy, when he has actually been assaulted with deadly weapons and compelled to fly for safety, and when, after he has thus escaped, this enemy announces to the members of his own family the intention to take his life whenever and wherever he may find him.

This distinction is recognized by all the standard writers upon the English criminal law. It is thus stated by East (1 P. C. 271, 272.): "A man may repel force by force in defense of his person, habitation, or property, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as rape, robbery, arson, burglary, or the like. In these cases he is not obliged to retreat, but

may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing, it is justifiable self-defense; as, on the other hand, the killing by such felons will be murder. But a bare fear of any of these offenses, however well grounded, as that another lies in wait to take away the party's life, unaccompanied by any overt act indicative of such an intention, will not warrant him in killing that other, there being no actual danger at the time."

The doctrine of this author seems to be that fear, though grounded upon the fact that one lies in wait to take a party's life, or upon the murderous threats of a desperate and determined enemy, will not, in the absence of actual danger at the time, justify the party so endangered or threatened in slaying his adversary. But that when this lying in wait or these threats have been accompanied by an actual attempt to kill, and from all the attendant circumstances the party in danger believes, and has the right to believe, that he can escape the constantly impending danger, which becomes imminent whenever his foe is present, in no other way except to kill such foe, he is not obliged when he may casually meet him to fly for safety nor to await his attack.

However this may be, the threats of even a desperate and lawless man do not and ought not to authorize the person threatened to take his life; nor does any demonstration of hostility short of a manifest attempt to commit a felony justify a measure so extreme. But when one's life has been repeatedly threatened by such an enemy, when an actual attempt has been made to assassinate him, and when, after all this, members of his family have been informed by his assailant that he is to be killed on sight, we hold that he may lawfully arm himself to resist the threatened attack. He may leave his home for the transaction of his legitimate business, or for any lawful and proper purpose; and if on such an occasion he casually meets his enemy, having reason to believe

him to be armed and ready to execute his murderous intentions, and he does believe, and from the threats, the previous assault, the character of the man, and the circumstances attending the meeting he has the right to believe, that the presence of his adversary puts his life in imminent peril, and that he can secure his personal safety in no other way than to kill him, he is not obliged to wait until he is actually assailed. He may not hunt his enemy and shoot him down like a wild beast; nor has he the right to bring about an unnecessary meeting in order to have a pretext to slay him; but neither reason nor the law demands that he shall give up his business and abandon society to avoid such meeting. The instructions under consideration are inconsistent with this view of the law, and are therefore deemed erroneous.

It is complained that incompetent and illegal testimony was permitted to go to the jury; but as the alleged error will not likely occur on the next trial of the appellant, it is not necessary that we should pass upon it. So far as any portions in the opinion in Phillips's case are inconsistent with this opinion the same are overruled. In the Carico case (7 Bush, 124) the judgment of the circuit court was reversed upon a question growing out of the refusal of said court to admit certain legal testimony. Judge Hardin, while expressing his inclination to overrule the Phillips case to some extent, recognized it as authority until overruled by this court, but did not fully concur in the opinion of Judge Robertson as to the law of the Carico case; and Judge Peters declined to express any opinion upon that branch of the case discussed by Judge Robertson, believing that the facts did not bring it within the principle decided in the Phillips case.

For these reasons it is manifest that the opinion of Judge Robertson, so far as it relates to the principle of self-defense, is but an expression of his individual views, and not binding upon this court.

For the errors pointed out in this opinion the judgment appealed from is reversed, and the cause remanded for a new trial upon principles consistent herewith.