Syllabus.

[No. 2056.]

WILLIAM PENLAND v. THE STATE.

1. MURDER.— INDICTMENT is sufficient to charge murder in the first degree if it alleges that the murder was committed with "malice aforethought." See the statement of the case for an indictment *held* sufficient to charge murder in the first degree.

2. JUSTIFIABLE HOMICIDE — EVIDENCE — THREATS.— Threats made by the deceased against the slayer can afford no justification for homicide in the absence of evidence showing that, at the time of the homicide, the deceased, by some act then done, manifested an intention to execute the threat. No such evidence was adduced upon this trial, but, upon the contrary, it was incontestably shown that the deceased, when killed, was making no demonstration whatever, and was shot from ambush. *Held,* that the trial court properly excluded evidence of threats uttered by the deceased against the defendant.

3. SAME — SELF-DEFENSE.— Homicide is permitted by the law of this State (Penal Code, article 570) when inflicted for the purpose of preventing murder, but the killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit the offense. This rule has been so enlarged as to embrace cases of reasonable apprehension of death or serious bodily injury, whether the danger was real or apparent, but the reasonable apprehension and appearances must be such as spring from and arise out of the acts and conduct of the deceased at the time of the killing. In other words, to justify a homicide upon the ground that it was committed to prevent the murder of the slayer by the deceased, the killing must be done in the face of actual or apparent danger, and not upon the bare fear that the deceased meditates the murder of the slayer. See the opinion *in extenso* on the question, and note a case in which the rule cannot be invoked as a defense.

4. SAME — EVIDENCE.— It is a well established rule that the right of self-defense does not arise when there is opportunity to restrain the assailant by process of law. One who believes his life in danger must, if he have access to a tribunal clothed with the ordinary powers of a justice of the peace, apply to such tribunal to interpose; for, if he has ground enough to excuse him for killing the person from whom he apprehends danger, he has ground enough to have that person bound over to keep the peace, or committed in default of bail. Whenever this process can be applied, the endangered party is not excused in taking the law into his own hands. For the apparent purpose of showing that, when the homicide was committed, the courts of the country were destitute of machinery with which to enforce the law, the defense proved by a witness that the witness was the judge of the district court of the county in which the homicide was committed, at the time it was committed, and proposed to prove by him the condition of the country as to the ability of the courts to enforce efficiently the penal laws of the State. *Held,* that the evidence was properly excluded as irrelevant, the fact that the witness was judge of the district court at that time, and the further fact that the defendant was arrested by the civil officers for the homicide, being ample to show that the courts were clothed with ample power to enforce the penal laws.

5. MURDER — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Ellis. Tried below before the Hon. Anson Rainey.

The appellant in this case was convicted of murder in the first degree, and awarded as punishment a life term in the penitentiary, under an indictment, the charging part of which, referred to in the first head-note of this report, reads as follows:

"  .  .  .  that one William Penland, on the 21st day of February, A. D. 1864, with force and arms, in the county of Ellis, did then and there, unlawfully, feloniously and with his malice aforethought, make an assault in and upon the body of one A. J. Saffell, and that the said William Penland, a certain gun then charged with gunpowder and one leaden bullet, which said gun the said William Penland in his hands then and there had and held, then and there feloniously, wilfully and with malice aforethought, did discharge and shoot off to, against and upon the said A. J. Saffell, and the said William Penland, with the leaden bullet aforesaid, and of the gun aforesaid, then and there by force of the gunpowder aforesaid, by William Penland discharged and shot off as aforesaid, then and there feloniously, wilfully and of his malice aforethought, did strike, penetrate and wound him, the said A. J. Saffell, in and upon the back of him, the said A. J. Saffell, giving to him, the said A. J. Saffell, then and there with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the gun aforesaid by the said William Penland, in and upon the back of him, the said A. J. Saffell, one mortal wound of the depth of eight inches, and of the breadth of the half of an inch, of which said mortal wound, he, the said A. J. Saffell, then and there instantly died. And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said William Penland, him, the said A. J. Saffell, in the manner, and by the means aforesaid, feloniously, wilfully and of his malice aforethought, did kill and murder; contrary," etc.

Mrs. A. L. Thompson was the first witness for the State. She testified that she was the wife of the deceased at the time of his death, on the 21st day of February, 1864. The deceased died from the effects of a gun-shot wound in the back. He was at the time of his assassination a soldier in the Confederate army, but was at home on furlough. His furlough had expired, and he had perfected his arrangements to start back to his regiment in the field. He was to leave on Monday morning, February 22d, but was killed on Sunday evening, February 21st. He had then overstayed his furlough a week in consequence of losing his horse. The loss of his army horse necessitated his making arrangements to procure another, which de-

tained him at home.   About 3 o'clock on the fatal Sunday evening, the witness and the deceased left their home to walk to a neighboring creek, a third of a mile distant, to look at some timber which had been recently cut.   A pathway led from the house to a bend in that creek, which witness and deceased followed perhaps half way, and turned off to the right, and reached a point on the creek nearer than the bend.   The witness produced a diagram similar to the following:

The residence of the deceased and the witness is represented in the above diagram by the letter " H."   " Creek " represents Onion creek.   " C." represents the crossing at the bend of the creek. " Path " represents the pathway from the residence to the crossing. " P." represents the point where witness and deceased left the path

and turned to the creek at the point represented by "D." At the point "D." on the creek, the witness and the deceased sat down and talked for perhaps an hour, and then started home, walking arm in arm, the deceased to the right of the witness. They struck the path on their return at a point nearer the crossing "C." than the point "P." at which they left it going to the creek at "D." At or near the time they reached the point "P." on their return, the witness heard the report of a gun. Witness and deceased were still walking arm in arm, but the deceased was loitering very slightly in the rear. When the gun fired the deceased sprang forward and stopped, seeming somewhat dazed. Witness asked him if he was hurt, and he replied: "Yes, on the shoulder." He walked on a few steps and laid down, his arm under his head, and died immediately without uttering another word. Mr. Young's family arrived upon the scene first, and were soon joined by others, when the body was taken home. Witness did not see the wound.

Cross-examined, the witness stated that when the deceased joined the army in 1862, he left the defendant in charge of his place and stock, and the witness went to board at Mr. Boren's. Some time afterwards in the fall of 1862, the defendant went to the army, the witness understood as a substitute for some one, but was not accepted, and returned. During the defendant's absence, the witness went back home and took possession of her husband's place and stock. She did so because deceased had not intrusted the place and stock to defendant's boys, whom defendant left in charge, but to defendant himself. When the witness took possession, the family of the defendant moved to the O'Herron place, a mile and a half distant, and remained there during the absence of the defendant in Arkansas, where he had gone to enlist in the army as a substitute. Defendant joined them on the O'Herron place when he returned, and he and his family lived there when deceased was assassinated. On his return from Arkansas after his rejection as a substitute, the defendant came to and about the house of the deceased, and cursed and abused witness for taking possession. This conduct he repeated frequently, and on each occasion declared that he would kill the deceased. Witness informed the deceased by letter of the conduct and threats of the defendant. At the instant that the gun fired, the witness turned her head and saw a puff of smoke ascending from behind some bushes near the point on the creek marked "D.," where witness and deceased had been sitting but a few minutes before. Witness saw no one at the time. Deceased had no arms about his person, when shot. The assassination

occurred in Ellis county, Texas, on the 21st day of February, 1864. The witness had never paid or promised to pay John Braley any sum of money to apprehend the defendant. The Governor of Texas at one time offered a reward of $500 for the apprehension of the defendant, which reward, the witness supposed, has been revoked.

Mrs. Brumbach was the next witness for the State. She testified that she spent the Saturday night before the Sunday on which deceased was assassinated, at the house of the defendant. She slept in a room which was also occupied by the defendant, his wife and some of his children. Witness awakened sometime between midnight and day, and saw the defendant loading his gun. She said nothing, and supposed that the defendant and the others of his family who were awake thought that she was still asleep. While lying there awake witness heard the defendant say that he intended to kill Saffell. The defendant and his son Steve left the house sometime before day, and as they passed out of the door, witness heard the defendant say to his wife: "Old woman, we will have meat before we get back." Defendant was in the room between a quarter and a half hour after witness waked up.

On her cross-examination the witness stated that the defendant was a hunter by occupation, used a gun in that avocation, and had venison in his house on the Saturday night in question. The witness was unable to say what he meant by saying that he would have meat before he came back. Witness left the defendant's house after breakfast, and heard of the murder of the deceased on that evening.

Rich. Cunningham, colored, was the next witness for the State. He testified that, a short time after the assassination of Saffell, he met the defendant, who said to him that his gun never failed, and did not fail that time. Witness could not now remember that the defendant mentioned Saffell's name on that occasion, or that he admitted that he had killed Saffell. Witness did remember that defendant exhibited to him a scar on the back of his head which had not yet healed, though it had scabbed over. This conversation occurred either at the O'Herron or the Pinckney Sims place, two places on Onion creek, five or six miles apart. Others besides the witness were present, but witness was now unable to name them. If the conversation occurred at the Pinckney Sims place, Captain Veale's nephew, besides several colored people, was present. If it occurred at the O'Herron place, witness could not recall the name of any one present, though he knew that several were present. Witness was then a slave, and the property of G. H. Cunningham, who was a member of the same company in the Confederate army in

which the deceased served. Defendant in the same conversation said that he knew "it was his last chance, and that he intended to have his revenge."

A. J. Wright was the next witness for the State. He testified that he was the first man ever elected to the office of sheriff of Hood county, and was serving as such sheriff when he formed the acquaintance of the defendant, sometime in 1867. Defendant came to witness and told him that he had killed a man in Ellis county; that he was justified in killing him, but that, nevertheless, it might be that an indictment would be presented against him, and a *capias* for his arrest sent to witness for service; that if so, he was on hand and ready to be taken into custody. He told witness that the man whom he had killed, about three weeks before the killing, rode up on him on the road or the prairie, chased him, shot him, beat him over the head, and left him lying on the ground, under the impression that he was dead; that after some time he recovered sufficiently to sit up and attract the attention of some travelers, who took him home; that after his assailant, the man whom he had killed, heard that he was not dead, he sent him word that "if that shot did not kill him, he had another one that would, and that he would kill him before he went back to the army." The defendant also, on that same occasion, said that he knew at the time that the man he killed was going to start back to the army on the next day; that he knew him to be a desperate character and would kill him before leaving. He said to witness: "I knew this was my last chance, and I saw the man coming down to the spring or watering place. He had a woman walking with him, arm in arm, or with her arm around him. I waited until the woman passed out of range, and fired, intending to break his back, but hit him in the side of the back under the arm, just under or over the woman's arm." He told witness that the man wore a checked shirt, but witness did not remember that he said he fired at a check, and hit close to the spot he fired at. He fired, he said, from a distance of about one hundred and ten yards.

John Braley, the next witness for the State, testified that he served as sheriff of Ellis county, Texas, from 1882 until 1884. He had, while sheriff, a *capias* for the arrest of the defendant, and arrested him on it. It was here agreed that the *capias* referred to was issued on the old indictment which was presented in 1864, and which was quashed at this term of the court, when the present indictment was returned. Witness found and arrested the defendant at the town of Trickham in Coleman county. While the witness was with Boy Simmons, then sheriff of Coleman county, he saw

the defendant go from a store in that town to a wagon. He followed and hailed him as follows: "How are you, Uncle Billy. Is not your name Penland?" Defendant said: "Yes." Witness then asked: "Are you the man who killed Saffell down in Ellis county several years ago?" Defendant replied: "Yes, I am the man." He said in the same connection: "I did it in self-defense, and thought I had a right to. He shot me down about three weeks before and left me for dead, and had sent me word that if that shot did not kill me, he had another that would, and I knew my only chance was to kill him. I shot him about eighty steps off, and hit him within two inches of where I aimed." Defendant made these statements before the witness exhibited his *capias*, or arrested him, or told him that he was sheriff of Ellis county. The State rested.

N. F. Penland was the first witness introduced by the defense. The defense proposed to prove by him that the deceased shot the defendant about three weeks before the assassination, and frequently afterwards uttered threats to kill defendant, which threats were reported to defendant by various parties. This testimony was ruled out, and that ruling of the court is the subject-matter of the second head-note of this report. Proceeding, the witness testified that he was aged forty-three, and was a son of the defendant. He was younger than his deceased brother, Steve. At the time of the killing of deceased, and for six months previous thereto, the defendant was an epileptic, and frequently, sometimes as often as twice a day, had hard "fits" or attacks of epilepsy. Some three weeks before the death of Saffell, the defendant received a wound in his head which resembled a gun-shot wound. The bleeding from this wound appeared to relieve the epileptic disorder, and defendant had no more attacks so far as the witness knew. The defendant and the witness were arrested two or three days after the death of Saffell, and taken to Waxahatchie. The witness was released within a day or two, and went home. A few days after the witness's release the defendant reached home, and remained closely confined to the house for a couple of weeks. He did not leave his premises during that time, and exercised great care not to be seen by any one except the members of the family. He then left home and went to what is now Hood county. He came back home during the following July, remained at home a few days, and left again during the fall. The family afterwards moved to Cherokee county, where they found the defendant. They stayed there about one year, when they moved to Hood county, where they remained some two years. Thence they removed to Travis county and remained a year, whence they

removed to Coleman county, in which county and McCulloch county they had resided ever since. Witness had no recollection of ever having known the State's witness, Rich. Cunningham. Witness, however, was certain that Cunningham could not have seen the defendant at the O'Herron place after Saffell's death, and while the wound on his head was still unhealed, and heard him talk in the presence of several parties. The defendant kept entirely too close and secluded at home at that time, for any such thing to have occurred. Defendant could not have been at Pinckney Sims's spring and had such a conversation on either of his visits home after Saffell's death. Witness knew of but two occasions upon which harsh words passed between the defendant and Mrs. Thompson, then the wife of Saffell. Those two occurred on the O'Herron place, after defendant's family had left the Saffell place, after defendant returned from Arkansas, and before Saffell returned from the army. Mrs. Saffell began the controversy on both of those occasions, and used very abusive language to the defendant. Defendant did not curse Mrs. Saffell or threaten the deceased. Mrs. Saffell and defendant frequently met on friendly terms after those two occasions, but with somewhat more restraint than formerly. The witness knew of no other trouble between Mrs. Saffell and the defendant.

Miss M. A. Penland, the daughter of the defendant, testified in his behalf that she was about thirteen years old at the time of Saffell's death. She was not at home on the night before Saffell's death occurred, but got home on that Sunday evening near sundown. Witness was not certain that her father was at home when she got back on Sunday evening, but it was her recollection that he was. For six months prior to the death of Saffell the defendant had suffered from severe epileptic fits. Witness could only remember that he had one of those fits after Saffell's death. For the larger part of the three weeks next preceding the death of Saffell, the defendant had been "laid up" with a wound on the back of his head and shoulder. The wound looked like a gun-shot wound. It cut the scalp and skull, and passed down into the shoulder, and had not healed up at the time of Saffell's death. The witness did not think that the defendant's mind was in good condition at the time of Saffell's death, nor did she think it had been good since he first contracted the epilepsy. Witness's mother and her brother Steve were dead. Respecting the troubles between Mrs. Thompson, then Mrs. Saffell, and defendant, the witness testified substantially as did N. F. Penland.

Boy Simmons was the next witness for the defense. He testified

that he was the sheriff of Coleman county at the time of defend-
ant's arrest by John Braley. Witness went with Braley to the
town of Trickham in Coleman county, where they found the de-
fendant trading in a store. His wagon was standing out in front
of the store. Defendant was sitting on the counter in the store,
when witness and Braley went in, and Mr. Hunter was putting up
some goods for him. Braley ordered cigars and passed them around.
Defendant soon went to his wagon and got in. Witness touched
Braley and said: "There is your man." Braley started towards
the store door, and witness told Hunter that Braley was the sheriff
of Ellis county, and had come to arrest Penland for murder, and
that he, witness, disliked to see the old man "pulled" after so long
a time. When Braley got to the door, he said to defendant: "How
are you, Uncle Billy?" Defendant, who was then in the wagon,
bowed. Braley then said: "I am the sheriff of Ellis county, and
have a *capias* for your arrest for the murder of Saffell, in Ellis
county." Braley read the *capias* to defendant, who got out of the
wagon, and the two returned to the store. When he made the
arrest, Braley stood with one foot on the doorstep, and one on
the wagon wheel. Defendant did not admit, before the *capias* was
read to him, that he was the man who killed Saffell. Witness was
standing where he could hear everything that was said and see
everything that was done.

On his cross-examination, the witness was asked the following
question: "Did you not, on yesterday, in this court room, and in
the presence of Mr. Cooper and Mr. Chapman, make this statement:
'I helped to arrest old man Penland. Braley asked him if his
name was Penland, and he said yes. Braley then asked him if he
was the same man who killed Saffell down in Ellis county. He
said: Yes, I am the man, but I did it in self-defense. He had shot
me down and left me for dead, and sent me word that if that shot
did not kill me, he had another that would; and I saw him coming
down to the creek, and took aim at him, and shot him within two
inches of where I aimed, and just above or just below his wife's
arm which was around him; and then Braley told him he was
sheriff and arrested him?'" Witness replied: "No, I did not say
all of that in the way it is asked. I did say it all, but did not say
that it was so said by Penland before he was arrested; and in fact,
what was said by Penland (as asked) was said after Braley told him
he was sheriff and made the arrest." At this point the defense
moved that the statement of the witness as to what was said by

defendant after his arrest be stricken out, and withdrawn from the jury; which motion was overruled.

Mr. Hunter was next introduced by the defense. He testified that, at the time of the arrest of defendant by Braley, he was postmaster at the town of Trickham, Coleman county, and a dealer in merchandise, keeping the postoffice in his store. Braley and Simmons came into the witness's store, where the defendant was making some purchases. Braley purchased some cigars and passed them around. Defendant went out to his wagon, which stood near the door. Simmons "nudged" Braley and said: "That is your man." Braley started to the door, and Simmons told witness that Braley was the sheriff of Ellis county, and had a *capias* for the defendant, and that he disliked to see the old man arrested. Thereupon the witness turned to a window near the door and saw Braley speak to the defendant, who was in his wagon. The old man bowed and spoke, when Braley told him that he was the sheriff of Ellis county, and had a *capias* for his arrest, which he took from his pocket and read. Witness did not know what defendant said when he bowed to Braley, more than to exchange the usual "good day." At this point the defense closed.

The State recalled John Braley in rebuttal. He testified that when he had the talk with defendant, and a few minutes later arrested him, defendant was in his wagon, which stood some ten steps from the store door. Witness had defendant in his custody for several months during the year 1884, and was never able to detect anything indicating disease of the mind. John Fleming, deputy-sheriff and jailer under Sheriff Braley, testified as did Braley as to the apparent condition of defendant's mind while in Braley's custody.

· Dr. Smith testified for the State, in rebuttal, that he had been for some time the attending physician to defendant. He had never observed any impairment of the defendant's mind.

J. P. Cooper testified for the State, in rebuttal, as follows: "I am the clerk of the district court of Ellis county, and was present on yesterday and heard the witness Boy Simmons make to Mr. Chapman a statement substantially as follows: 'I helped to arrest old man Penland. Braley asked him if his name was Penland, and he said yes. Braley then asked him if he was the man who killed Saffell down in Ellis county. He said: Yes, I am the man, but I did it in self-defense. He shot me down and left me for dead, and sent me word if that shot did not kill me, he had another that

would. I afterwards saw him coming down to the creek and took aim at him and shot him in two inches of where I aimed, and just below or just above his wife's arm, which was around him, and then Braley told him he was the sheriff of Ellis county, and arrested him.' "

The motion for new trial raised the questions discussed in the opinion.

*A. A. Kemble*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. The homicide out of which this prosecution arose occurred over twenty-one years before appellant was brought to trial for the murder.

In so far as the motion in arrest of judgment on account of supposed substantial defects in the indictment as a charge for murder of the first degree is concerned, suffice it to say that the question has been repeatedly decided in opposition to the grounds taken in the motion, and the latest and fullest discussion of the subject, together with all the authorities collated, can be found in the opinions delivered in the case of *Sharpe* v. *The State*, 17 Texas Ct. App., 486. An indictment charging a murder to have been committed with "malice aforethought" charges murder of the first degree. (Willson's Crim. Forms, No. 388, p. 173.)

On the examination of the State's witnesses it was made to appear by the testimony of the witnesses Wright and Braley, from declarations made by defendant to them, that some three weeks prior to the homicide, Saffell, the deceased, had shot and seriously wounded appellant. These declarations concerning this previous difficulty and shooting are in substance the same as they are detailed by each of these witnesses, and we reproduce them from the testimony of Braley because stated by him more concisely. This witness was the sheriff of Ellis county, who arrested defendant. He says, "before I arrested him, and before I told him I was sheriff of Ellis county, I asked him if he was the man that killed Saffell. He said, 'yes, I am the man.' He also said that he 'did it in self-defense,' and 'I thought I had a right to; he had shot me down about three weeks before and left me for dead, and had sent me word that if that shot did not kill me he had another that would, and I knew my only chance was to kill him. I shot him about eighty steps off, and hit him within two inches of where I aimed.' " All the evidence showed

that deceased was shot in the back, and his wife, who was with him at the time, testifies that he was shot from the brush behind them, and that they could not see and did not know who did the shooting.

In connection with this testimony defendant proposed to prove by his son, A. F. Penland, all the facts and circumstances attending the shooting of defendant by deceased; subsequent threats made at different times by deceased to different persons against defendant; that on several occasions between the shooting of defendant and the killing of Saffell the latter was seen in and about the premises of defendant, both in the day and night time, and that these things had been communicated to defendant; which evidence was, upon objection by the prosecution, excluded by the court as irrelevant and immaterial.

As here involved, the question is not the admissibility of explanatory acts and declarations of defendant with reference to parts of acts and declarations admitted against him, and consequently the rule provided by article 751 of the Code of Criminal Procedure with regard to such explanatory matters is not applicable. If admissible at all, the proposed evidence was or could only be authorized and competent in support of or as throwing light upon the theory of the defense, which was justifiable homicide committed in self-defense. All the evidence, the admissions and declarations of defendant as well, wholly rebut the idea that the deceased, at the time he was killed, had the most remote idea of the proximity or presence of defendant,— much less that he was armed for the purpose, and at that time was meditating upon or manifesting any intention to carry into execution any previous threat made by him against the defendant. "When a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made." (Penal Code, art. 608; *Logan* v. *The State*, 17 Texas Ct. App., 50.)

Upon this point the language used by the court in *Allen* v. *The State*, 17 Texas Ct. App., 637, is peculiarly appropriate to the testimony exhibited in this record. "Evidence of threats made by the deceased against the defendant could afford no justification for the homicide, in the absence of any evidence showing that, at the time of the homicide, the deceased, by some act then done, manifested an intention to execute the threat. There was no such evidence

adduced on the trial, but, on the contrary, it was proved that the deceased was not making any demonstration whatever against defendant." And this fact was established as well by the confessions of defendant as the testimony of deceased's wife.

Deceased, who was a Confederate soldier, had been at home on furlough. He was spending his last Sabbath evening with his wife. In the morning he was to start to rejoin his command. He and his wife had strolled down into the creek-bottom; had sat upon the bank of the stream for half or three-quarters of an hour, talking of their future hopes and plans. They rose and started to return home, walking side by side, she with her arm around him, when, upon reaching a certain point in the pathway, of a sudden there is the report of a gun from the bushes in the direction from which they have just come. He starts suddenly; she asks him if he is hurt; he answers yes, steps forward a few steps, falls forward upon his face, and is instantly dead. He is shot in the back, just an inch or so above the place where his wife's arm was clasped about him, and where defendant said he had aimed to shoot him, so as to avoid shooting his wife through the arm. In the face of such testimony it is worse than idle and absurd to claim the protection of self-defense under the law of threats made by a deceased against his slayer. His own confessions as to how the homicide was committed fully corroborated the testimony of the wife of the deceased, and effectually eliminated all claim of self-defense on account of threats. The proposed evidence was wholly irrelevant, and could have thrown no light upon his conduct which would have tended in the slightest to justify it.

The theory of the defense is that defendant, from the antecedent circumstances and the threats which deceased had made against him, firmly and honestly believed that his own life would be taken unless he killed deceased, and hence that the killing was justifiable in self-defense. Under our statute homicide is permitted by law when inflicted for the purpose of preventing murder, but the killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense. (Penal Code, art. 570, subdivis. 2; *Stevenson* v. *The State*, 17 Texas Ct. App., 618; *Boddy* v. *The State*, 14 Texas Ct. App., 528.) This rule has been justly enlarged so as to embrace cases of reasonable apprehension of death or serious bodily injury, whether the danger was real or apparent; but the reasonable apprehension and appearances must be such as spring from and arise out of the acts and conduct of the deceased at the

time of the killing. (*Smith* v. *The State*, 15 Texas Ct. App., 338; *Jones* v. *The State*, 17 Texas Ct. App., 603.)

But, whilst a party is permitted by law to take human life to prevent any of the offenses named in article 570 of the Penal Code, yet "a bare fear of any of these offenses (murder, robbery, or the like), however well grounded, as that another lies in wait to take away the party's life, unaccompanied with any overt act indicative of such an intention, will not warrant him in killing that other by way of prevention; there must be an actual (or apparent) danger at the time. (1 East's Crown L., 272.) . . . The belief that a person designs to kill me will not prevent my killing him from being murder, unless he is making some attempt to execute his design, or at least is in apparent situation to do so, and thereby induces me reasonably to think that he intends to do it immediately. (4 Iredell, N. C., 409.) The right of resorting to force does not arise while the apprehended mischief exists in machination only. (1 Whart. Cr. L., § 260.) No contingent necessity will avail; and when the pretended necessity consists of the as yet unexpected machinations of another, the defendant is not allowed to justify himself by reason of their existence." (*Lander* v. *The State*, 12 Texas, 462.) "No apprehension of danger previously entertained will justify the commission of homicide; it must be an apprehension existing at the time the prisoner struck the blow." (Hor. & Thomp. Cases Self-Def., 646; *Holt* v. *The State*, 9 Texas Ct. App., 572.)

A doctrine about the broadest and most favorable in its presentation of the rule of self-defense is stated by the supreme court of Kentucky in Bohannon's case. It is said in that case: "When one's life has been repeatedly threatened by such an enemy (a desperate and lawless man), when an actual attempt has been made to assassinate, and when after all this his family have been informed by his assailant that he is to be killed on sight, we hold that he may lawfully arm himself to resist the threatened attack. He may leave his home for the transaction of his legitimate business, or for any lawful and proper purpose; and if on such an occasion he casually meets his enemy, having reason to believe him armed and ready to execute his murderous intention, and he does believe, and from the threats, the previous assault, the character of the man, and the circumstances attending the meeting, he has the right to believe that the presence of his adversary puts his life in imminent peril, and that he can secure his personal safety in no other way than to kill him, he is not obliged to wait until he is actually assailed. He may not hunt his enemy and shoot him down like a wild beast, nor has

he the right to bring about an unnecessary meeting in order to have a pretext to slay him, but neither reason nor the law demands that he shall give up his business and abandon society to avoid such meeting." (*Bohannon* v. *The Comm.*, 8 Bush, 481; *S. C.*, 1 Green's Crim. R., 613; *State* v. *Kennedy*, 7 Nev., 137.)

But there is another view of the case suggested by one of the bills of exception in the record. Defendant proved by Judge Ferris that he, the witness, was district judge in Ellis county in 1864, and asked him " what was the condition of the country in Ellis county in the spring of 1864 as to the ability of the courts to enforce the criminal and penal laws with efficiency?" The answer was excluded or not permitted on objection by the State that it was immaterial and irrelevant.

A well-settled rule is that the right of self-defense does not arise when there is opportunity to restrain the assailant by process of law. (Foster, 277; 1 Hawk. P. C., ch. 29, § 17.) " A man who believes his life in danger must, if he have access to a tribunal clothed with the ordinary powers of a justice of the peace, apply to such tribunal to interpose. If he have grounds enough to excuse him from killing the person from whom he believes himself in danger, he has ground enough to have that person bound over to keep the peace or committed in default of bail. And wherever this process can be applied, the endangered party is not excused in taking the law into his own hands. Where the conflict can be avoided, the law must be resorted to for redress. Of course the rule just stated presupposes the law gives machinery by which, if my life is threatened, I can cause the arrest of my expected assailant. Suppose, however, the law gives no such machinery? Am I to be shot down without the means of prevention by an assassin who will fire on me at sight? Am I to wait to receive the shot in order to comply with the technical requisite that, before I can fire, an attempt should be made on my life? In a state of nature where there is no law to which I can appeal to have such a villain restrained, I am entitled, in order to save my life, to take the law into my own hands, though I do this at my own risk." (Whart. on Hom. (2d ed.), §§ 488, 489.)

As we understand it, no such state of things was attempted to be proved by the witness. The very fact that he was district judge shows that the law had its machinery in operation, though the State was involved in a terrible war between the States, then going on. It is, moreover, shown by this record that this defendant and his son were arrested by the civil officers for this very homicide. The evidence sought was, in our opinion, irrelevant, immaterial, and properly denied.

A number of other errors are complained of. We are free to confess that the record shows some irregularities which should not have occurred, but we fail to perceive how they could or have prejudiced the rights and interests of defendant. For aught that has been made to appear, defendant has had a fair and impartial trial, in which all his material, essential rights have been protected and secured him. The charge of the court, save in an immaterial particular, was the law of the case, and it was not error to refuse the requested instructions.

Long years have passed since this homicide was committed, yet the law knows no limitation as against the crime of murder. Defendant confessed to its commission and the circumstances of its commission. He has claimed that it was justifiable on the ground of self-defense. We have fully examined and discussed this defense in the light of the law and the facts. Manifestly the homicide was committed under circumstances showing no immediate danger or present necessity excusing it; no provocation at the time arousing a passion sufficient to reduce it to a lower degree of crime; no act, word or gesture of deceased which would or could extenuate or mitigate it; in a word, nothing which the law can consider in extenuation, mitigation, excuse or justification for the act. Of its character and degree there can be but one opinion. By every rule of law the crime was murder, and murder by lying in wait,— assassination,— murder in the first degree.

The judgment is affirmed.

*Affirmed.*

[Opinion delivered November 14, 1885.]