CASE 96—INDICTMENT FOR MANSLAUGHTER—JAN. 25.

# Commonwealth v. Rudert.

APPEAL FROM GRAYSON CIRCUIT COURT.

J. B. RUDERT WAS ACQUITTED OF THE CHARGE OF VOLUNTARY MAN-
SLAUGHTER, AND THE COMMONWEALTH APPEALS.  OPINION CERTI-
FIED.

HOMICIDE—SELF DEFENSE—INSTRUCTIONS TO JURY.

Held:  1. It was error to give instructions as to self-defense when
there was no evidence upon which to base them.
2. Though deceased had threatened to kill accused, it was error to
instruct the jury that they might acquit on the ground of self-
defense if they believed that deceased had formed an intention
to kill accused, and was then about to arm himself for the
purpose of carrying into execution that intention, as the danger
or apparent danger must be immediate, to justify the taking
of life.

W. S. CHELF AND R. J. BRECKINRIDGE, FOR APPELLANT.

J. S. WORTHAM, FOR APPELLEE.

(No brief in the record.)

OPINION OF THE COURT BY JUDGE WHITE.

The appellee, Rudert, was indicted in the Grayson Cir-
cuit Court, charged with the crime of voluntary manslaugh-
ter.  Upon trial he was acquitted, and this appeal is prose-
cuted by the Commonwealth in order to have determined
certain rulings of the court on the trial which are assigned
as error.

The facts of the killing, as shown by the evidence certi-
fied in the record, are that the accused, Rudert, was on the
9th day of September, 1899, agent of the Illinois Central
R. R. at Leitchfield, Ky.  On that day he attended a polit-
ical speaking at the court house at about 1 o'clock, and,

when the speaking was over, went back to the depot—his place of business. The deceased, Hardison, came into the depot and asked for a telegram. There was no message. Hardison and the accused got into a political discussion, which became very animated, and deceased used some vile epithets towards accused. A bet was made on some proposition of political difference, and each insisted that the other should prove the position assumed by him in the bet. The argument continued, and Hardison became very angry and called Rudert "a God-damned thieving son of a bitch," and demanded that his dollar bet should be returned. Rudert refused to allow the stakeholder to return it. Thereupon Hardison became more abusive, and Rudert ordered him out of the depot. Hardison refused to go, with an oath. Rudert held the door partly open, but still Hardison refused to go. Rudert told him if he would go out he would give him his money back. Hardison then started for the door in a run, and says: "God damn you! I am going to have my money. I will make you give it up."

Rudert stepped back as Hardison started out, and, getting his pistol out of a drawer near by, snapped it twice at Hardison as he approached the outer door. Hardison stopped and looked back, and Rudert says, "If you won't go I will shoot you." Hardison says, "To hell with you," and continued on out of the door in a run, when Rudert fired, striking Hardison in the back. As Hardison passed Kelly's store, near the railroad track, he said, "I will shoot the God-damn son of a bitch."

Hardison went home, between 78 and 100 yards distant, and got his pistol, and came back to the depot platform, but Rudert had gone up town. From the wound received, Hardison died in about three days. It was proven that Hardison did not like Rudert, and that in June, before this

difficulty in September, Hardison said, referring to Rudert, that he would fix his clock for him; said substantially this to two witnesses. After these threats the two men, Rudert and Hardison, were together, and on one occasion Rudert had dressed a mashed finger for Hardison. Before this difficulty Rudert had received information that Hardison had killed a man at Greenville, Ky. It was shown that Hardison was at times quarrelsome and disagreeable and was inclined to drink, and on the day of the shooting had been drinking some. Rudert was shown to have a good character for peace and quiet. After the shooting, Rudert voluntarily surrendered. It was shown that at Greenville Hardison had borne a good reputation for peace and quiet.

Upon the trial the court gave instructions numbered 1, 2, 3, 4, 5, and 6, and refused to give instruction numbered 7. It is conceded by counsel that instructions 1, 2, 3, and 5 are correct statements of the law. However, it is not conceded that numbers 2 and 3, on self-defense, should have been given in this case. Instructions 4 and 6 are assailed as erroneous. They read: "No. 4. If the jury believe from the evidence that the defendant, Rudert, from all the circumstances in the case at the time he shot Hardison, believed, and had reasonable grounds for believing, that Hardison had formed the intention to kill him or do him great bodily harm, and then and there made demonstrations to carry out such purpose, and was then about to arm himself with a deadly weapon near at hand, and immediately return and carry out such purpose, the defendant was not required to retreat, but had the right to stand and use such force as was apparently necessary to save himself from the danger then about to be inflicted upon him; and if, in the use of such force, Hardison was killed, the defendant is excusable, and should be acquitted."

"No. 6. The foregoing instructions are modified as follows: The uncontradicted evidence in this case shows that at the time of the difficulty between defendant and Hardison, and at the time defendant shot Hardison, the defendant was in the depot building, where his business required him to be, and over which he had control; and at no time during the difficulty was the defendant required to retreat from said house in order to escape real or apparent danger at the hands of Hardison, if there was real or apparent danger."

We are of opinion that there was no evidence on which to base an instruction of self-defense, and therefore only instructions Nos. 1 and 5 should have been given in this case.

While instructions 2, 3, and 6 may state abstract principles of law, they were not applicable to the case at bar, for the reason that there was no proof of an assault of any kind by the deceased, nor was there a then threatened assault, the proof being that deceased was shot in the back while running from the depot.

Instruction No. 4, *supra*, in our opinion, is not the law in any case, and should not be given. This court, in the Bohannon Case, 8 Bush, 481, laid down the rule to be that fear grounded upon threats, or upon information that one lies in wait, will not justify the party so threatened or endangered in killing his antagonist, unless the threats or lying in wait have been accompanied by an actual attempt to kill or to commit some other known felony; and not then unless the person so circumstanced believes and has reasonable grounds to believe, that the presence of his enemy puts his life in imminent peril, and that he can escape peril in no other way. In the opinion stress is laid on the fact that an actual attempt had been made to carry out the threatened intention to kill Bohannon.

The court said that the person threatened may leave his
home for any lawful purpose, and if he casually meets his
enemy, "having reason to believe him to be armed and
ready to execute his murderous intentions, and he does be-
lieve, and from the threats, the previous assault, the char-
acter of the man, and the circumstances attending the
meeting, he has the right to believe, that the presence of
his adversary puts his life in imminent peril, and that he
can secure his personal safety in no other way than to kill
him, he is not obliged to wait until he is actually assailed.
He may not hunt his enemy and shoot him down like a wild
beast, nor has he the right to bring about an unnecessary
meeting in order to have a pretext to slay him, but neither
reason nor the law demands that he shall give up his busi-
ness and abandon society to avoid such meeting."

One of the conditions laid down by the court in warrant-
ing a killing without waiting to be attacked is that the
person have reason to believe his adversary to be armed
and ready to execute his murderous intention.  In the case
at bar the proof shows, and the instruction is based on the
idea, that when Hardison was shot he was not armed, and
was not ready to execute an intention to kill accused.  But
there is no proof of a recent threat to kill by Hardison, un-
til after he was shot.  True, it is shown that in June he
had threatened to harm or kill accused, but up to that time
had made no attempt or demonstration to do so, although
he and accused had often met.

In the Kennedy case, 14 Bush, 340, the court said:
"Threats, menaces, assaults, lying in wait, carrying arms,
the character of the deceased for violence and lawlessness,
the circumstances of the meeting, and any other fact tend-
ing to show that the slayer was in peril at the *time* of the

*homicide* (italics ours), or that he had reasonable grounds upon which to believe he was in such peril, may all be given in evidence for the purpose of showing that there were grounds to believe he was *then* in danger (italics ours); but if, notwithstanding all these things he had no reasonable grounds for believing he was *then* in danger (italics ours), they will not excuse him on the ground of self-defense, *although they may have justified him in believing he would be in such danger at some future time* (italics ours). This is in consonance with the philosophy of the law of self-defense, which is based on necessity, real or apparent.

"When there is no necessity or apparent necessity to slay an adversary to save one's life or person from great bodily harm, there can not, in the nature of things, be a right to kill in self-defense."

The court in that case was very clear that the danger, real or apparent, must exist at the time of the killing. It is not enough that it appears that the danger will come at some future time. It might have been in the case at bar that this threat, if such it was, made at the depot, would end, as the previous threats had ended, in talk. Accused had no right to assume otherwise and kill Hardison, because he feared danger would arise in the future—even in the near future. The danger must be immediate—exist or appear to exist at the time of the killing—to constitute self-defense. To show that danger did exist or appeared to exist, the threats, menaces, assaults, etc., may be shown. But where it is shown there was no danger, and the accused knew deceased was not armed, and therefore there was no danger at the time, the killing could not be justified in self-defense. There was no necessity then existing, and this fact was known to the accused. In the Oder case, 80 Ky., 32, the court follows the opinion in the Kennedy

case, and declares the law to be "that, when a person has been merely threatened by even the most lawless character, it furnishes no legal excuse for taking his life."

In the Parsons case, 78 Ky., 102, the Kennedy case is reaffirmed as the law, and an instruction approved which said: " . . . that on the occasion when the accused met and killed the deceased, if he did kill him, he believed, and had reasonable grounds to believe, such danger was then and there pending, and that he could secure his personal safety in no other way," etc.

In the Parsons case objection was made to "then and there," in the quotation, but the court held it proper.  In Turner's case, 89 Ky., 78, (1 S. W., 475), the court said: "There is no case establishing the doctrine that one has the right to pursue his adversary until out of danger, except the Phillips case, 2 Duv., 328, that has been overruled, and certainly no case that would justify or excuse one for lying in wait and slaying his adversary, without or with warning, although he had been previously threatened and assaulted with a deadly weapon by the deceased."

The reason of this rule is that there is no danger then and there impending—no necessity.  The Haverly case, 95 Ky., 33, (23 S. W., 664), presented the fact that the deceased had made threats to "do up or fix" the defendant, and on several occasions assaulted him, but not with a deadly weapon, nor was the assault such as to indicate an intention to commit a felony.  The court said that the facts did not warrant the court in giving instructions as in Kennedy and Oder cases, and that a refusal to so instruct was not error.  There is no case, so far as we are advised, that goes to the length of justifying a killing, as in self-defense, because the deceased had formed an intention to kill accused and was then about to arm himself for the  purpose  of

carrying into execution the intention. To justify a killing there must at the time exist, or appear to exist, danger to the life of the slayer, or danger of great bodily harm being inflicted upon him.

The necessity or apparent necessity for action then to free himself from his adversary must exist, or he will not be justifiable. That at some future time he may be or become in danger, or that at some future time action may be necessary to protect himself, will not justify a killing. The danger or apparent danger—the necessity or apparent necessity—must be in the present, to justify or excuse such extreme measure as the taking of human life. If the expression that was used by Hardison when he started to run out of the depot be denominated a threat to kill, it would place accused in no greater danger than he had been in on several occasions since the June before, when it is shown that deceased threatened him, yet nothing had resulted from the threats,—nothing at any time that would have justified the killing of the deceased. But for the shooting by accused, the same results might have followed this threat, if such it was.

The expression used by the deceased was: "God damn you! I am going to have my money. I will make you give it up." There is no expressed intention to kill accused or do him great bodily harm, and certainly nothing that expressed an intention by deceased to arm himself with a deadly weapon, and return and carry out a purpose to kill or do great bodily harm. Under no view of the law was instruction No. 4 proper. There was a verdict of acquittal, so that no reversal can be had, but this is ordered certified as the law.